**Roosevelt LATHAN and Pearline Lathan, his wife, et al., Plaintiffs-Appellants,**

**v.**

**John A. VOLPE, as Secretary of the United States Department of Transportation, et al., Defendant-Appellee.**

**No. 71-1149.**

United States Court of Appeals, Ninth Circuit.

Nov. 15, 1971.

Rehearing Denied Feb. 8, 1972.

---

J. Anthony Kline (argued), Berkeley, Cal., Michael J. Fox, John Gant, Hall Baetz, Peter E. Paget, of Schweppe, Doolittle, King & Tausend, Roger M. Leed, of Schroeter, Jackson, Goldmark & Bender, Seattle, Wash., for plaintiffs-appellants.

Thomas R. Garlington, Asst. Atty. Gen. (argued), Slade Gorton, Atty. Gen., Tumwater, Wash., Walter Fleischer (argued), Robert E. Kopp, Ronald R. Glacz, Dept. of Justice, Washington, D. C., Stan Pitkin, U. S. Atty., Albert E. Stephen, Asst. U. S. Atty., Seattle, Wash., for defendant-appellee.

Before JERTBERG, DUNIWAY and CHOY, Circuit Judges.

DUNIWAY, Circuit Judge:

Plaintiffs, residents of a section of downtown Seattle through which a proposed interstate highway is to be built, seek to halt all further acquisitions of property by state highway officials until certain statutory, administrative, and constitutional requirements are met. Defendants are the Secretary of Transportation and various federal and state highway administrators. Plaintiffs appeal from denial of their motion for a

preliminary injunction. We vacate the order and remand.

A. *The facts.*

After several years of preliminary study, beginning in 1944 and continuing into the 1960s, the State of Washington proposed an interstate highway (I-90) to be built in a corridor between particular interchanges of two existing interstate highways (I-5 and I-405) under the terms of the Federal-Aid Highways Act, 23 U.S.C. § 101 et seq. Within the selected corridor, three routes were chosen by the State as possible ones to be considered at a public hearing pursuant to 23 U.S.C. § 128, which was held on March 5, 1963. Following the hearing, the State selected a corridor for the final location of I-90, which received approval by the Federal Bureau of Public Roads on May 20, 1963.

In June 1970, the State held a public hearing on the design of that segment of I-90 to be constructed within the chosen corridor in Seattle. Federal approval of the design has not yet been sought or obtained, nor has federal approval for right-of-way acquisition or construction. However, federal authorization has been given to the State for the acquisition of 184 housing units which the property owners asked the State to buy because "undue hardship" would result from following the standard procedure of deferring acquisition until after federal approval of the design. These so-called hardship acquisitions, authorized by a Department of Transportation regulation (DoT IM 20-1-69, April 8, 1969), had by September 4, 1970, resulted in 103 families moving out of the corridor area to other parts of Seattle.

The trial judge found that the persons requesting these "hardship" acquisitions have obtained decent, safe and sanitary housing. The defendants assert and we assume that these persons have also received the payments for relocation authorized by the Act (23 U.S.C. §§ 504-507), and have been assisted by an active program of scrutiny to be sure that replacement housing is decent, safe and sanitary. For the purpose of this case, we also assume that the state has been endeavoring to maintain the properties sold to it in a decent, safe and sanitary condition.

Nevertheless, it is not really disputed that the choice of a corridor, such as occurred in this case in 1963, is bound to have a deleterious effect on the area within the corridor. As a practical matter, there is no longer an open market for the property in the corridor; there is only one potential buyer, the state. The inevitable effect is a lessening of the property owner's motivation to maintain his property and a depressing effect upon property values and the general physical, economic and social tone of the area. Residents know that many, if not all, of them are going to have to move out; owners know that most, if not all, of them are going to have to sell. The type of community spirit that seeks to preserve, protect, and improve a neighborhood is bound to disappear under these conditions. These effects are so well known, and so obvious, to those familiar with the urban scene that we would be naive indeed to believe that they do not exist within the corridor here in question, or that they do not exist in this case to an exacerbated extent. The corridor runs through a densely populated, low income, city area; the residents are primarily the poor and persons of minority races.

Plaintiffs, residents of the portion of the corridor area called the Central Area, seek to prevent continued progress on the planning and construction of I-90, until *inter alia*, (1) the defendants comply with the relocation provisions of the Federal-Aid Highway Act of 1968, 23 U.S.C. §§ 502 and 508; (2) the federal defendants comply with the National Environmental Policy Act of 1969, (NEPA), 42 U.S.C. § 4321 et seq.; and (3) a new public hearing on the proposed highway route is had.

B. *The statutory scheme.*

We take from the brief of the federal defendants a description of the statutory scheme. The Federal-Aid Highways Act,

23 U.S.C. § 101 et seq., establishes a grant-in-aid program under which the federal Government will pay 90% of the cost of interstate highways if the Secretary of Transportation finds the State plans comply with standards set forth in the Act.

The building of any section of federally-funded roadway (designated a "project") involves a series of successive stages. There is, at the outset, the "program" stage, during which a state desiring financial assistance is to "submit to the Secretary for his approval a program or programs of proposed projects for the utilization of the funds apportioned" for any fiscal year (23 U.S.C. § 105). The Secretary's approval of any "program" does not bind the Government to a contractual obligation.

Next come the "routing" and "engineering design" stages, which form the focus of this litigation. Following approval of the program by the Secretary, the State selects the different project routes (23 U.S.C. § 103(d)) and prepares, for the Secretary's review—and approval if the proper standards are met —"such surveys, plans, specifications, and estimates for each proposed project included in an approved program" as relate to the route location. 23 U.S.C. § 106(a). The same process is repeated with respect to design.

23 U.S.C. § 128(a) provides that any State highway department which submits plans for a federal-aid highway project involving the "going through" of any city shall certify to the Secretary that it has held public hearings and has considered the effects of such location. As originally enacted (P.L. 85–767, Aug. 27, 1958, 72 Stat. 902) this section required only that the "economic" effects of such highway location be considered. The amended version of this section (P.L. 90–495, § 24, Aug. 23, 1968, 82 Stat. 828) now provides that in addition to the economic effects of such location, these hearings should also consider its "social [effect] * * *, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community." This statute has been interpreted by the Department of Transportation as requiring two public hearings on a highway "going through" a city; once for the location of the route, i. e., a "corridor hearing", and once concerning the design, i. e., a "design hearing". See PPM 20–8 (January 14, 1969) para. 6.

If the Secretary is satisfied with the certification and other information he receives, he first approves the route location and thereafter the design as part of the approval under Section 106; even after such approvals, there is still no contractual obligation on the part of the Government to expend funds for right-of-way acquisitions or project construction.

No purchase of right-of-way ordinarily occurs during the "routing" and "engineering design" stages. However, Policy and Procedure Memorandum (PPM) 20-8 (January 14, 1969), para. 10.e, and Instructional Memorandum (IM) 20-1-69, para. (4), as amended by IM 20-1-69(2) provide that where a property owner demonstrates he is suffering hardship due to the possible construction of an interstate highway, he may request the State authorities to purchase his property. The State, with federal approval, is authorized to make such purchase and obtain federal reimbursement.

The "right-of-way acquisition" stage follows the "engineering design" stage. Apart from the hardship exception and certain others defined in IM 20-1-69, *supra*, no right-of-way acquisition can be authorized until after the design has been approved. PPM 20-8 (January 14, 1968), para. 10.d(2). By regulation, right-of-way surveys, plans and specifications are then filed with the Federal Government (PPM 20-5). After the adoption of Chapter 5 of the Federal Highway Act of 1968, 23 U.S.C. § 501 et seq., the Federal Highway Administration issued an Instructional Memorandum (IM) 80-1-68, which became the

applicable regulation for implementing the new relocation assistance program. Pursuant to 23 U.S.C. § 502, and paragraph 5 of IM 80-1-68, the State must submit "satisfactory assurances" that it can provide prospective displacees with adequate relocation housing and payments. Under paragraph 7 of the IM, "prior to proceeding with right-of-way negotiations and/or construction," a State is required to prepare a detailed plan of relocation "for review and approval by the division engineer." If the division engineer is satisfied, authorization to purchase parcels of land within the project right-of-way is given under 23 U.S.C. § 106, and the Government is then contractually obligated to participate in such acquisitions.

Finally, there is the actual "construction" stage (PPM 21-7), which is to "be undertaken by the respective State highway departments or under their direct supervision" (23 U.S.C. § 114). It cannot commence without federal authorization from the division engineer.

In short, federal law establishes five stages in the construction of a federally financed highway: program, routing, engineering design, right-of-way acquisition, and actual construction. The facts relevant to the present case pertain entirely to the routing and design stages.

In addition to the above provisions of law, the National Environmental Policy Act of 1969, (NEPA), 42 U.S.C. § 4321 et seq., which took effect on January 1, 1970, establishes additional requirements pertaining to the construction of federally financed highways. This Act provides among other things that the impact of all "major" federal actions which significantly affect the quality of human environment be considered by the responsible federal official and that before such major actions are taken a detailed statement of environmental impact be prepared by the responsible Federal official.

Federal Highway Administration regulations require similar environmental impact evaluations from state highway departments seeking federal approval and aid for interstate highway projects.

The defendants do not argue that Chapter 5 of the Highway Act and NEPA do not apply to this case. They concede their applicability, but deny that the time to apply them has yet arrived. The trial judge agreed with them.

C. *The posture of the case.*

Because this appeal is from the denial of a preliminary injunction, defendants rely on cases holding that the plaintiffs must show that they are likely to prevail on the merits, that the balance of irreparable harm favors the issuance of the injunction, and usually that the public interest supports granting the injunction. Moore's Federal Practice, Vol. 7, ¶ 65.04; Yakus v. United States, 1944, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834; Ohio Oil Co. v. Conway, 1929, 279 U.S. 813, 815, 49 S.Ct. 256, 73 L.Ed. 972; Schwartz v. Covington, 9 Cir., 1965, 341 F.2d 537, 538.

We think, however, that this is one of the exceptional cases falling within the principle announced by the Supreme Court in United States v. City and County of San Francisco, 1940, 310 U.S. 16, 60 S.Ct. 749, 84 L.Ed. 1050. There, in answer to a similar argument, the Court said (pp. 30-31, 60 S.Ct. p. 757):

"* * * we are satisfied that this case does not call for a balancing of equities or for the invocation of the generalities of judicial maxims in order to determine whether an injunction should have issued. * * * The equitable doctrines relied on do not militate against the capacity of a court of equity as a proper forum in which to make a declared policy of Congress effective."

Here, the basic facts are not disputed. The only question is when and how the admittedly applicable statutes must be applied. That the statutes are designed to implement important public policies is conceded. The manner and timing of their application is cru-

cial. The longer there is delay in applying Chapter 5 of the Federal Highway Act, the more hardship sales to the state there will be, and the fewer will be the residents of the corridor who receive the full benefit of the chapter. The longer the delay in applying NEPA, the more the neighborhood will have deteriorated and the less will be the chance to protect the city and its people from the environmentally detrimental effects of this project. In short, this is one of those comparatively rare cases in which, unless the plaintiffs receive *now* whatever relief they are entitled to, there is danger that it will be of little or no value to them or to anyone else when finally obtained.

1. 23 U.S.C. § 502 provides:
"Assurances of adequate relocation assistance program.
The Secretary shall not approve any project under section 106 or section 117 of this title which will cause the displacement of any person, business, or farm operation unless he receives satisfactory assurances from the State highway department that—
(1) fair and reasonable relocation and other payments shall be afforded to displaced persons in accordance with sections 505, 506, and 507 of this title;
(2) relocation assistance programs offering the services described in section 508 of this title shall be afforded to displaced persons; and
(3) within a reasonable period of time prior to displacement there will be available, to the extent that can reasonably be accomplished, in areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families and individuals displaced, decent, safe, and sanitary dwellings, as defined by the Secretary, equal in number to the number of and available to such displaced families and individuals and reasonably accessible to their places of employment."
2. The Uniform Relocation Act by its terms repeals 23 U.S.C. § 501 et seq. on July 1, 1972, or sooner if the State is authorized by its own law to provide the payments and assistance required by the URA (§ 221(c)). Since Washington law apparently does not authorize the State highway department to provide

**D.** *The relocation provisions of Federal-Aid Highway Act.*

Chapter 5 of the Federal-Aid Highway Act of 1968, 23 U.S.C. § 501 et seq.,[1] and its successor the Uniform Relocation Act, 84 Stat. 1894,[2] require the state defendants to submit satisfactory assurances to the federal defendants that within a reasonable period prior to displacement there will be available for persons displaced by state acquisitions of land for the proposed highway adequate replacement housing ("decent, safe, and sanitary dwellings, equal in number to the number of, and available to, such displaced families and individuals * * *.") The implementing regulations define such "assurances" in detail[3] and defendants admit that they

that assistance, the relocation provisions of the Federal-Aid Highway Act have not yet been repealed by the URA and are fully applicable to the I–90 project. Even if the URA were applicable, all rights existing under 23 U.S.C. § 501 et seq. were specifically preserved by the new Act (Section 220(b)).

3. DoT IM 80–1–68 provides, in relevant part:
"5. ASSURANCES OF ADEQUATE RELOCATION ASSISTANCE PROGRAM.
"a. No state highway department shall be authorized to proceed with any phase of any project which will cause the displacement of any person or any construction project concerning any right-of-way acquired by the State without Federal participation and coming within the provisions of paragraph 2b(3) above, until it has furnished satisfactory assurances to the extent State law permits, that:
(1) Relocation payments and services were or will be provided as set forth in paragraphs 6–10 of this memorandum.
(2) In the event housing available to persons without regard to race, color, religion or national origin will not be available within a reasonable period of time prior to displacement as provided in paragraph 7 of this memorandum, the State shall provide a detailed statement specifying the respects in which such assurance cannot be furnished, the extent to which such housing will be available prior to displacement, the period of time prior to displacement when that housing will become available and an estimate of the additional

time within which such housing will become available to the extent that it can be reasonably accomplished.

(3) The public was or will be adequately informed of the relocation payments and services which will be available, as set forth in paragraph 12 of this memorandum.

(4) No person lawfully occupying the real property shall be required to move from his home, farm or business location without at least 90 days written notice of the intended vacation date from the State or political subdivision having responsibility for such acquisition. This provision must be carried out to the maximum extent practicable and exceptions should be made only in the case of very unusual conditions. Such assurance can be furnished on a Statewide basis or set forth in Point 31 of the State's statement of organization and procedures.

(5) The State's relocation program is realistic and is adequate to provide orderly, timely, and efficient relocation of displaced individuals and families to decent, safe, and sanitary housing available to persons without regard to race, color, religion or national origin with minimum hardship on those affected.

"b. The above assurances are not required where authorization to acquire right-of-way or to commence construction has been given prior to the issuance of this memorandum. The state will pick up the sequence at whatever point it may be in the acquisition program at the time of issuance of this memorandum.

"c. The State's assurances shall be accompanied by a statement in which it specifies the provisions of this memorandum with which it is unable under its laws to comply in whole or in part. In the event a State maintains that it is legally unable to comply fully with one or more of the provisions of this memorandum, its statement shall be supported by an opinion of the chief legal officer of the highway department in which he discusses the legal issues raised and cites reasons and authorities in support of his conclusion for each representation of legal inability to comply.

\*     \*     \*     \*     \*

"7.   DEVELOPMENT OF RELOCA-TION PROGRAM PLAN.

The planning for the relocation program shall be accomplished in stages:

a.   Conceptual Stage. A project will be considered to be in this stage until such time as the final location is approved. At this stage the tenant is not to be disturbed in any way. The cost incurred in connection with securing this information is chargeable to preliminary engineering. Prior to the completion of this stage and prior to the public hearing, the State shall make preliminary investigations which will furnish the following information for each of the various alternative locations given final consideration.

(1) Approximate number of individuals, families, businesses, farms, and nonprofit organizations that would be displaced.

(2) The probable availability of decent, safe, and sanitary replacement housing within the financial means of those displaced.

(3) The basis upon which the above findings were made and a statement relative thereto by the State to the Bureau of Public Roads.

b.   Right-of-way Acquisition and/or Construction Stage. The State highway department, prior to proceeding with right-of-way negotiations and/or construction shall furnish the following information for review and approval by the division engineer:

(1) The method and procedures by which the needs of every individual to be displaced will be evaluated and correlated with available decent, safe, and sanitary housing at reasonable rents or prices and readily accessible to his place of employment.

(2) The method and procedure by which the State will assure an inventory of currently available comparable housing available to persons without regard to race, color, religion or national origin which is decent, safe, and sanitary, including type of building, state of repair, number of rooms, needs of the person or family being displaced (based on standards outlined in paragraph 13a), type of neighborhood, proximity of public transportation and commercial shopping areas, and distance to any pertinent social institutions, such as church, community facilities, etc. The use of maps, plats, charts, etc., would be useful at this stage.

(3) An analysis relating to the characteristics of the inventories so as to develop a relocation plan which will:

(a) outline the various relocation problems disclosed by the above survey;

(b) provide an analysis of Federal, State and community programs affecting the availability of housing currently in operation in the project area;

(c) provide detailed information on concurrent displacement and relocation

have not been given. They claim that such assurances are not required until final federal approval is given to the project, which has not yet occurred.

In our opinion, the defendants' view is not supported either by the language of the statute or by its purpose.

1. *The language of the statute.*

Section 502 (fn. 1, *supra*) prohibits approval *"under § 106"* of any project which *"will cause the displacement* of any person, business * * * unless he receives satisfactory assurances * * * that—

* * * * * *

"(3) *within a reasonable time prior to displacement* there will be available * * *" housing.

And Section 511(3) defines a "displaced person" as "any person who moves * * * *as a result of* the acquisition or *reasonable expectation of acquisition* of [his] property * * * for a Federal-aid highway. * * *" 23 U.S.C. § 511(3). (*Emphasis added.*)

The approval of the corridor in 1963 was, as the federal defendants say in their brief, "under § 106." We think it pure sophistry to say that the 184 owners who sold out to the state, and the 103 families who moved out, as a result of such sales, were not displaced, or that they did not sell or move "as a result of a reasonable expectation of acquisition" of the property, or that the project did not "cause the displacement[s]."

As the state defendants say:

"Once a corridor has been established, the foreseeable condemnation of property within that corridor often renders such property unmarketable for a fair price. This condition may exist for several years and, in some cases, depending upon the circumstances, imposes an enormous hardship upon various property owners."

2. *The purpose of the statute.*

The policies behind the enactment of Chapter 5 point to the same conclusion. The purpose of the chapter is to protect all persons who will be displaced from their homes because of a federal-aid highway program. Nothing in its language, or in the legislative history cited to us, suggests that it is to become fully operative only when the final design is approved and actual condemnation proceedings are authorized. If the purpose of the statute is to be accomplished, it must be fully implemented not later than the approval of the "corridor" or "route" of the highway under section 106.[4] At that point, the route is known, although the precise location of the right of way within it is not. At that point all of the pressures leading to displacement come into play. Unless the state is then in a position to give the statutory assurances as defined by the Secretary, there is danger that displacements will proceed without anyone's knowing whether the requirements of the statute can be fully met. "Hardship" displacements may use up all of the available housing that meets statutory requirements, leaving the project stalled and the remaining residents of the corridor trapped in a deteriorating area, because

---

by other governmental agencies or private concerns;

(d) provide an analysis of the problems involved in the method of operation to resolve and relocate the relocatees;

(e) estimate the amount of leadtime required and demonstrate its adequacy to carry out a timely, orderly and humane relocation program;

(f) assure no person lawfully occupying real property shall be required to move without at least 90 days written notice; and

(g) furnish the names of the agency or agencies, if other than the State, which will provide the relocation assistance including an analysis of their present workload and ability to perform and the *estimated number and job titles* of relocation personnel servicing the project."

4. Here, the corridor was approved in 1963; Chapter 5 was adopted in 1968. At that point it became the duty of the defendants to comply with it.

at the time of design approval the necessary assurances cannot be given.

### 3. *The Secretary's regulations.*

The Secretary appears to have interpreted Chapter 5 as applying before the final approval stage. DoT Instructional Memorandum 80-1-68 states in ¶ 2(b) (3) that its provisions apply to rights-of-way acquired without Federal participation upon which the State "intends to construct" a federal-aid highway. Such projects would not necessarily have received final federal approval at that stage. Paragraph 5 of the same memo states: "No State highway department shall be authorized to proceed with any phase of any project' which will cause displacement of any person * * * until it has furnished satisfactory assurances * * *." That paragraph clearly does not limit its application to projects for which final federal approval was being sought. On the contrary, it would seem to apply squarely to the situation here, in which federal approval has been given for the highway location and federal authorization has been given for acquisitions of much property on a hardship basis.

None of defendants' other arguments appear persuasive. General statewide assurances and promises to comply for all federal-aid projects do not satisfy the specific requirements of 23 U.S.C. § 502 and DoT IM 80-1-68. No exception to the relocation requirements is provided in the case of hardship acquisitions; the only exception granted for those situations is from the requirement of design approval prior to the beginning of formal displacement proceedings. See DoT IM 20-1-69, ¶ 4. If the portions of the DoT Manuals providing for hardship acquisitions are construed, as defendants suggest, to excuse full compliance with Chapter 5 until after the design is approved, they are, to that extent, inconsistent with the statutory scheme and invalid.

To delay compliance could well result in the situation that faced the Fifth Circuit in Concerned Citizens for the Preservation of Clarksville v. Volpe, 5 Cir., 1971, 445 F.2d 486, (1971). There, acquisition of property had proceeded in spite of the failure of the State to submit relocation assurances, so that by the time the appeal from the district court's denial of a preliminary injunction reached the Fifth Circuit the case had become moot by displacement of virtually all residents. No irreparable injury will result to defendants from granting the injunction, and any irreparable injury to those residents who genuinely qualify for hardship acquisitions can be avoided by permitting such transactions upon approval by the district judge granting the injunction.

The public interest, as evidenced by the policies embodied in 23 U.S.C. § 501 et seq., supports the granting of a preliminary injunction. One purpose of the statutory scheme was to protect the public interest by insuring that the housing market in a particular area could handle the influx of persons displaced by a federal-aid highway project. The public interest would be best served by requiring the defendants to halt further activity which displaces persons from the corridor until the statute's requirements have been satisfied.

### E. *The National Environmental Policy Act.*

Plaintiffs claim that the I-90 project is proceeding in violation of NEPA, 42 U.S.C. § 4321 *et seq.,* because no environmental impact statement has been prepared and submitted as required by the statute. They are right.

■ The statute and implementing regulations indicate beyond question that the requirements of NEPA apply to the I-90 project. The DoT, like other federal agencies which undertake activities which may affect the environment, must prepare and submit a so-called Section 102(2) (C) statement of the environmental impact of major federal actions. I-90 already qualifies as a major federal action, even though final federal approval of design or construction plans has not yet been given. Federal highway officials approved the proposed lo-

cation of I-90 in 1963 and have continued to authorize acquisitions of property for the right-of-way since that time. Given the purpose of NEPA to insure that actions by federal agencies be taken with due consideration of environmental effects and with a minimum of such adverse effects, it is especially important with regard to federal-aid highway projects that the § 102(2) (C) statement be prepared early. If defendants' contention were accepted—that no environmental impact statement is required until the final approval stage—then it could well be too late to adjust the formulated plans so as to minimize adverse environmental effects.

Once the highway-planning process has reached these latter stages, flexibility in selecting alternative plans has to a large extent been lost. To paraphrase the District of Columbia Circuit, "In the language of NEPA, there is likely to be an 'irreversible and irretrievable commitment of resources,' which will inevitably restrict the [highway officials'] options. Either the [highway planners] will have to undergo a major expense in making alterations in a completed [plan] or the environmental harm will have to be tolerated. It is all too probable that the latter result would come to pass." Calvert Cliff's Coordinating Committee v. U. S. Atomic Energy Commission, D. C.Cir., 1971, 449 F.2d 1109 (1971).[5] This was clearly not the intent of Congress when it enacted NEPA.

The guidelines issued by the Council on Environmental Quality, a NEPA-created entity, also indicate that federal highway officials should have begun preparation of a Section 102(2) (C)

statement immediately after passage of NEPA:

"To the maximum extent practicable the Section 102(2) (C) procedure should be applied to further major federal actions having a significant effect on the environment *even though they arise from projects or programs initiated prior to enactment of the Act* on January 1, 1970. Where it is not practicable to reassess the basic course of action, it is still important that further incremental major actions be shaped so as to minimize adverse environmental consequences. It is also important in further action that account be taken of environmental consequences not fully evaluated at the outset of the project or program." 36 Fed.Reg. 7724 (April 23, 1971) (*Emphasis added.*)

The State defendants are required by Federal Highway Administration regulations implementing NEPA and DoT Order 5610.1 to evaluate the environmental consequences of federal-aid highway projects and make a determination that a detailed environmental statement is necessary or that a "negative declaration" of no significant environmental effect will suffice. See Interim Guidelines for Implementation of Section 102 (2) (C) of the National Environmental Policy Act of 1969.

Neither the federal nor the state defendants has complied with the requirements of the statute and regulations by submitting environmental impact statements, although acquisition of property for I-90 has proceeded with evidence of consequent adverse effects on the environment of the Central Area.

---

5. The Sixth Circuit found an analogous situation in a non-NEPA case, Nashville I-40 Steering Committee v. Ellington, 6 Cir., 1967, 387 F.2d 179, cert. denied, 1968, 390 U.S. 921, 88 S.Ct. 857, 19 L.Ed. 2d 982. The highway project there had proceeded almost to the construction stage, and the court felt it was too late to force a "chaotic" revision of the established plans:

"* * * despite the showing of heavy damage to the North Nashville area, we have no choice except to affirm the judgment of the District Court in refusing to grant a preliminary injunction.

"* * * It is * * * to be regretted that appellants waited so late to begin their efforts to correct the grave consequences which will result from the construction of this highway." 387 F.2d at 185–186.

## 1122

**F.** *Constitutional Validity of Location Hearing.*

■ Plaintiffs third contention is that the 1963 public hearing on the proposed location of I-90 deprived them of certain procedural rights guaranteed by due process of law. We need not decide the merits of this contention, since we think the equitable defense of laches is available to defendants. Plaintiffs failed to raise this claim for over seven years after the hearing took place, during which time they knew of the hearing and its alleged deficiencies. Defendants have expended a substantial sum of money in reliance on the validity of that proceeding. Thus the two essential elements of laches—lack of diligence by plaintiff and injurious reliance thereon by defendant—are present and plaintiffs are precluded from challenging the validity of the hearing at this late date.

**G.** *Relief.*

The order denying a preliminary injunction is vacated, and the case is remanded to the district court. The court shall order the State defendants to prepare and submit to the court forthwith a proposed schedule, setting forth the dates on which and the manner in which they will prepare and submit to the Department of Transportation (1) a relocation program which complies with the requirements of the statute and relevant implementing regulations, and (2) an environmental statement pursuant to the interim guidelines established by the Federal Highway Administration under DoT Order 5610.1. The court shall also order the federal defendants to prepare and submit to the court forthwith a similar schedule for preparing a Section 102 (2) (C) environmental impact statement in consultation with the appropriate government agencies as required by NEPA. Until such schedules are presented to the court, all further acquisitions of land by the defendants for I-90 shall be enjoined, with the possible exception of court-approved hardship acquisitions where special need is shown.

If the court finds, after giving full weight to the need for speed in obtaining compliance with these statutes and regulations, that the schedules presented to it by defendants are not adequate, it shall proceed on its own to set up a definite schedule of compliance for defendants to follow in performing their responsibilities under the law. If, on the other hand, the court is satisfied that the schedules presented are realistic and adequate, then it shall retain jurisdiction to insure compliance with the schedules and shall lift the injunction when it is satisfied that applicable federal law has been properly complied with.

Vacated and remanded with directions.

## OPINION ON PETITION FOR RE-HEARING

In their petition for a rehearing, the State defendants [1] call our attention to an error in our opinion relating to the federal Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 (URA). In footnote 2 of our opinion we stated that the law of the State of Washington does not authorize payments and assistance required by URA § 221(c). The fact is that Washington law does authorize such payments and assistance. Washington Uniform Relocation Act (Wash. URA) ch. 240, Wash. Laws of 1971, Ex.Sess., effective July 1, 1971. Under the URA, Pub. L. 91–646, 84 Stat. 1894 (42 U.S.C. 1970 Ed. ch. 61, § 4601 ff), Section 221, the pertinent sections of that Act became effective on July 1, 1971, by reason of Washington's adoption of its URA, and the corresponding sections of the Federal-Aid Highway Act of 1968, discussed in our opinion, were repealed. The adoption of Wash. URA and its effect were called to our attention, both in brief and on oral argument, but we nevertheless overlooked them. Our error, not that of the parties, necessitates this supplemental opinion.

■■ We believe that our opinion is a correct exposition of the law that was

---

1. The Federal Defendants have not petitioned for a rehearing.

in effect when the trial court acted. But we deal here with equitable relief by way of injunction, and we are bound to apply the Washington and federal laws as they now stand, not as they stood when the order appealed from was entered. *Cf.* Diffenderfer v. Central Baptist Church, 1972, 404 U.S. 412, 92 S.Ct. 574, 30 L.Ed. 2d 567, and cases cited. Nor does the existence of a saving clause in URA, sec. 220(b), affect this conclusion. That clause speaks of " . . . rights or liabilities *now existing under prior Acts.* . . . " It preserves rights accrued to persons displaced before URA became effective. But it does not speak to rights *in future, i. e.,* what rights persons not yet displaced may have. As to them, we are satisfied that URA and Wash. URA apply here. Appellants do not disagree.

The question is, are plaintiffs' rights and State defendants' duties different under the new Acts, and if so, how do they differ? We find but one significant difference.

■ Until it enacted URA, Congress had proceeded in piecemeal fashion in providing protection and assistance for persons displaced by federal or federally assisted projects. URA is an attempt to provide such protection and assistance in all such cases. It therefore replaces the previous jumble of statutory provisions. Their repeal is provided for in Section 220(a), which lists no less than eleven acts or parts of acts that are repealed. When Congress adopted URA, it heard much testimony to the effect that federal agencies, and particularly the Department of Transportation, had engaged in a pattern of evasion of the requirements of the Federal-Aid Highways Act and other Acts relating to relocation. See, *e. g.,* Hearings before the Committee on Public Works House of Representatives, 91st Cong., 1st and 2d Sess., on H.R. 14898 and 14899 and S.1 and related bills, at p. 371. There is no reason to believe that Congress intended to afford less protection or assistance to persons displaced than had been provided for in the Highways Act; quite the contrary. Thus under the Highways Act,

23 U.S.C. §§ 502(3) and 508(a) (2), replacement housing was to be assured "to the extent that can reasonably be accomplished." No such limitation appears in the corresponding § 205(c) (3) of URA. URA also increases the monetary payments to be made: Compare § 202(b) with former 23 U.S.C. § 505(b), § 203(a) (1) with former 23 U.S.C. § 506(a), and § 204 with former 23 U.S.C. § 506(b). See also § 206(a), applicable when existing housing is insufficient. See also §§ 205(c) and 210(2) and § 206(b) of URA.

■ As Mr. Justice Douglas, joined by Justices Black, Brennan, and Marshall, recently stated in a dissent to dismissal of a writ of certiorari as improvidently granted: "That Act [URA] . . . is so similar to the 1968 amendments [Chapter 5 of the Federal-Aid Highway Act] that any necessary interpretation of the 1968 amendments would be equally applicable to the 1970 Act." Triangle Improvement Council v. Ritchie, 1971, 402 U.S. 497, 504, n. 1, 91 S.Ct. 1650, 1653, 29 L.Ed.2d 61. Justice Harlan, concurring with the dismissal of the writ, did not dispute that contention by Justice Douglas. *Id.* at 501, 91 S.Ct. 1650. The question involved in that case was interpretation of Section 502 of the 1968 Act and the effect of its replacement by Section 210 and 205(c) (3) of URA.

Against this background, we examine URA. Section 210 of URA provides:

"Notwithstanding any other law, the head of a Federal agency shall not approve any grant to, or contract or agreement with, a State agency, under which Federal financial assistance will be available to pay all or part of the cost of any program or project which will result in the displacement of any person on or after the effective date of this title, unless he receives satisfactory assurances from such State agency that—

(1) fair and reasonable relocation payments and assistance shall be provided to or for displaced persons, as are required to be provided by a Fed-

eral agency under sections 202, 203 and 204 of this title;

(2) relocation assistance programs offering the services described in section 205 shall be provided to such displaced persons;

(3) within a reasonable period of time prior to displacement, decent, safe and sanitary replacement dwellings will be available to displaced persons in accordance with section 205(c) (3)."

Section 205(c) (3) gives a more detailed definition of such satisfactory assurances: ". . . . within a reasonable period of time, prior to displacement there will be available in areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents or prices within the financial means of the families and individuals displaced, decent, safe, and sanitary dwellings, as defined by such Federal agency head, equal in number to the number of and available to such displaced persons who acquire such dwellings and reasonably accessible to their places of employment, except that the head of that Federal agency may prescribe by regulation situations when such assurances may be waived."

■ We hold that § 210 of URA is just as much applicable when the corridor is approved as was former § 502 of the Highway Act. Section 210 prohibits approval of "any grant to, or contract or agreement with, a State agency" unless the requisite "satisfactory assurances" are received. Federal authorization of hardship acquisitions is an "agreement" on the part of the federal government to reimburse the state for the cost of acquisitions of property. DoT IM 80–2–70, ¶ 11(d) (2).

■ Section 101 of URA defines displaced persons as "any person who, on or after the effective date of this Act, moves from real property . . . as a result of the acquisition of such real property, in whole or in part, or as the result of the written order of the acquiring agency to vacate real property, for a program or project undertaken by a Federal agency, or with Federal financial assistance. . . . " We think it sophistry to say that persons who make "hardship" sales to the state or who leave the property because the owner makes such a sale, do not move "as a result of the acquisition", or to claim that their departures were "voluntary."

The Secretary's regulations interpret URA as applicable before the final approval stage of the project. The implementing regulation is IM 80–1–71.[2] Paragraph 7, a, deals with statewide as-

---

2. Pertinent provisions of IM 80–1–71 are:
"7. ASSURANCES OF ADEQUATE RELOCATION ASSISTANCE PROGRAM
  a. STATEWIDE ASSURANCES
No State highway department shall be authorized to proceed with any phase of any project which will cause the relocation of any person, or proceed with any construction project concerning any right-of-way acquired by the State without Federal participation and coming within the provisions of paragraph 6a of this memorandum until it has furnished satisfactory assurances on a statewide basis that:
  (1) relocation payments and services were or will be provided as set forth in this memorandum;
  (2) the public was or will be adequately informed of the relocation payments and services which will be available as set forth in paragraph 11 of this memorandum; and

  (3) to the greatest extent practicable no person lawfuly occupying real property shall be required to move from his dwelling, or to move his business or farm operation, without at least 90 days written notice from the State of the date by which such move is required.
  b. PROJECT ASSURANCES
No State shall be authorized to proceed with right-of-way negotiations on any project which will cause the relocation of any person until it has submitted specific written assurances that:
  (1) *Comparable Replacement Housing*
Within a reasonable period of time prior to displacement comparable replacement dwellings will be available or provided (built if necessary) for each displaced person. Such assurance shall be accompanied by an analysis of the relocation problems involved and a specific plan to resolve such problems as described in paragraph 15b of this memorandum.

surances which must be given before a State Highway Department may proceed with "any phase of any project which *will cause* the relocation of any person." [*Emphasis added.*] This provision speaks of relocations that will occur in the future. The State of Washington has given such statewide assurance, and claims that no more is required until the stage of final approval of the right-of-way. We disagree.

■ Paragraph 7, b, provides that "[n]o State shall be authorized *to proceed with right-of-way negotiations . . . which will cause* the relocation of any person until it has submitted specific assurances . . . dealing with the

particular project" (emphasis added). Their character is prescribed in detail in paragraph 15. Surely negotiations to acquire property for a highway on a "hardship" basis are "right-of-way negotiations" and "will cause" relocation. The Secretary thinks so. In paragraph 7, b, (1) he specifically refers to "hardship cases." Thus paragraphs 7, b, and 15 of . IM 80–1–71 are applicable now.

■ There is one difference of significance, however, between URA and the former provisions of the Highway Act. Section 205(c) (3) of URA authorizes the Secretary to prescribe by regulation situations when the assurances required may be waived. The Secretary

---

Where right-of-way is acquired in hardship cases and/or for protective buying the required assurance together with an analysis of the relocation problems involved and a specific plan to resolve such problems shall be provided for each parcel or for the project.

(2) *Adequate Relocation Program*

The State relocation program is realistic and is adequate to provide orderly, timely and efficient relocation of displaced persons as provided in this memorandum.

15. RELOCATION PROGRAM AT RIGHT–OF–WAY STAGE

   a. GENERAL REQUIREMENTS

The division engineer shall not authorize the State to proceed with negotiations on any project which will cause the relocation of any person until the State has submitted and he has approved the project assurances as provided for in paragraph 7b of this memorandum and the relocation plan required by subparagraph "b" below.

   b. RELOCATION PLAN

(1) *Inventory of Individual Needs*

The State shall prepare an inventory of the characteristics and needs of individuals and families to be displaced based on the standard of comparable replacement housing. This inventory may be based upon a sampling survey process rather than a complete occupancy survey. A State may utilize recent census or other valid recent survey data to assist in preparing the inventory. However, any sampling survey process must be to the depth necessary to be fully representative of the characteristics and needs of the relocatees.

(2) *Inventory of Available Housing*

The State shall develop a reliable estimate of currently available comparable replacement housing. The estimate shall set forth the type of buildings, state of repair, number of rooms, adequacy of such housing as related to the needs of the persons or families to be relocated (based on standards outlined in paragraph 5) type of neighborhood, proximity of public transportation and commercial shopping areas, and distance to any pertinent social institutions, such as church, community facilities, etc. The use of maps, plats, charts, etc., would be useful at this stage. This estimate should be developed to the extent necessary to assure that the relocation plan can be expeditiously and fully implemented.

(3) *Analysis of Inventories*

The State shall prepare an analysis and correlation of the above information so as to develop a relocation plan which will:

(a) outline the various relocation problems;

(b) provide an analysis of current and future Federal, State and community programs currently in operation in the project areas, and nearby areas affecting the supply and demand for housing including detailed information on concurrent displacement and relocation by other governmental agencies or private concerns;

(c) provide an analysis of the problems involved and the method of operation to resolve such problems and relocate the relocatees in order to provide maximum assistance; and

(d) estimate the amount of leadtime required and demonstrate its adequacy to carry out a timely, orderly and humane relocation program."

has utilized this authority to a limited extent in paragraph 7, b, (1) in the following language: "Where right-of-way is acquired in hardship cases and/or for protective buying, the required assurance together with an analysis of the relocation problems involved and a specific plan to resolve such problems shall be provided for each parcel or for the project." It is this requirement that the defendants must meet in this case. The State is required to supply, either for each parcel to be acquired or for the project, (1) assurances that within a reasonable period of time prior to displacement comparable replacement dwellings will be available or provided for each displaced person; (2) an analysis of the relocation problems involved, and (3) a specific plan to resolve such problems, in addition to the general assurances required by Section 210 of URA. So far as the record shows, the State has not done so and does not intend to unless the court requires that it shall.

The Federal defendants, not having received the required assurances, have been acting illegally, in authorizing, or paying out moneys for, the acquisition of properties.

The State defendants have presented with their petition for a rehearing an environmental statement prepared by the State, which, they say, has been submitted to the Department of Transportation. They thus claim that the portion of our judgment requiring the submission of such a statement is moot. We adhere to the view that such a statement is required, but prefer to leave to the trial judge a determination as to whether the statement in question meets the obligation of the State defendants.

Except to the extent that it is inconsistent with this opinion, our former opinion remains the opinion of the court.

The judgment of this court is modified, to read as follows:

The order denying a preliminary injunction is vacated and the case is remanded to the District Court. That court shall order the State defendants to prepare and submit to the court forthwith a statement showing the time or times when, and the manner in which, they propose to comply, for each parcel to be acquired, or for the project, with URA and IM 80–1–71 as herein construed. The State defendants shall submit to the court a copy of the environmental statement submitted to this court on November 30, 1971. The court shall order the Federal defendants to prepare and submit to the court forthwith a schedule for preparing a Section 102(2) (c) environmental impact statement in consultation with the appropriate governmental agencies as required by NEPA. Until such statement and schedule are submitted to the court, all further acquisitions of land by the defendants for the I–90 project herein involved shall be enjoined. The court may, however, in cases of genuine hardship, permit hardship acquisitions by the State if it complies with URA and IM 80–1–71 in connection with such acquisitions.

If the court finds, after giving full weight to the need for speed in obtaining compliance with these statutes and regulations, that the schedules presented to it by defendants are not adequate, it shall proceed on its own to set up a definite schedule of compliance for defendants to follow in performing their responsibilities under the law. If, on the other hand, the court is satisfied that the schedules presented are realistic and adequate, then it shall retain jurisdiction to insure compliance with the schedules and shall lift the injunction when it is satisfied that applicable federal law has been properly complied with.

Vacated and remanded with directions.

The petition for a rehearing is denied. No further petition for a rehearing may be filed. The mandate shall issue 10 days after the filing of this opinion. No further stay of the mandate will be granted by this court.