**COMMONWEALTH OF PENNSYL-VANIA et al., Plaintiffs,**

v.

**FEDERAL MARITIME COMMISSION and Helen Delich Bentley, Chairman Federal Maritime Commission, Defendants,**

Sea-Land Services, Inc., et al., Defendants-Intervenors.

Civ. A. No. 75-0363.

United States District Court, District of Columbia, Civil Division. April 25, 1975.

Gordon P. MacDougall, Washington, D. C., David Hughes, Asst. Atty. Gen. of Tex., Austin, Tex., for plaintiff State of Tex.

Gary B. Randall, Dept. of Justice, Douglas N. Jones, Edward Gruis, Washington, D. C., for defendants.

Edward M. Shea, Paul J. McElligott, John A. Douglas, Ragan & Mason, Robert L. McGeorge, Galland, Kharasch, Calkins & Brown, James H. Pipkin, Jr., Charles F. Warren, George A. Quadrino, John P. Meade, Neal M. Mayer, Paul D. Coleman, Washington, D. C., for intervenors-defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN H. PRATT, District Judge.

### Findings of Fact

*Nature of the Action and Procedural History.*

1. Plaintiffs are: the Commonwealth of Pennsylvania; the State of Texas; the Council of North Atlantic Shipping Associations, an unincorporated multi-employer bargaining association; the International Longshoremen's Association, AFL–CIO; and, the Delaware River Port Authority, a public corporation created to promote waterborne commerce in the Philadelphia area. Defendants are the Federal Maritime Commission (FMC) and Helen Delich Bentley in her official capacity as Chairman of the FMC.

2. This action is premised on alleged violations of the National Environmental Policy Act of 1969 (83 Stat. 852, 42 U. S.C. § 4321 et seq.) (NEPA). Plaintiffs allege that defendants have violated NEPA in several respects in connection with their handling of the so-called "Far East minibridge tariffs." Specifically, plaintiffs allege that the defendants failed to comply with NEPA when they accepted those tariffs for filing beginning in 1971 without making a determination as to whether such acceptance constituted a "major Federal action significantly affecting the quality of the human environment . . . ." (NEPA § 102(2)(C)). Plaintiffs also complain of an FMC order of February 10, 1975 in a pending complaint proceeding against the tariffs at issue (FMC Docket No. 73–38). In that order, the FMC asked the parties to submit information on environmental impact, expressing a belief that the Commission's decision at the conclusion of that proceeding would require an environmental impact statement. Plaintiffs contend that the FMC should have rejected the tariffs when it issued the order. Plaintiffs also allege that the request for environmental information constitutes an improper delegation of the preparation of an environmental impact statement. Plaintiffs further claim that the FMC is in violation of NEPA by failing to adopt general regulations and procedures pursuant to section 102(2)B of that Act. Plaintiffs request declaratory and injunctive relief.

3. Petitions for leave to intervene as parties-defendant were timely filed by a

number of affected water and rail carriers [1] and by the Trans-Pacific Freight Conference Japan/Korea and its member lines. All of these petitions were granted. In addition the Interstate Commerce Commission (ICC) and the Pacific Westbound Conference requested and received leave to intervene as *amici curiae*.

4. On March 17, 1975, plaintiffs filed a motion for declaratory judgment and preliminary injunction, with supporting memorandum and affidavits. This motion was opposed by all defendants, intervenor-defendants, the ICC and the Pacific Westbound Conference. In addition, intervenor-defendants filed a motion to dismiss, with supporting memorandum and affidavits, which motion was joined in by defendants and the ICC. Plaintiffs filed a memorandum in reply to the memoranda filed by defendants and defendant-intervenors. Plaintiffs also moved for summary judgment. On April 9, 1975, oral argument was heard from all parties on the motion to dismiss and plaintiffs' motion for declaratory judgment and preliminary injunction. At the conclusion of that hearing, the Court entered an order (1) denying plaintiffs' motion for preliminary injunction and (2) entering judgment against plaintiffs and in favor of the defendants and defendant-intervenors and dismissing the action. Based upon the memoranda of the parties, the affidavits and the oral argument, these findings of fact and conclusions of law are issued pursuant to Rule 52(a) of the Federal Rules of Civil Procedure in support of that Order.

*Description of Minibridge.*

5. Minibridge is an intermodal transportation system offered jointly by rail and ocean carriers pursuant to joint tariffs, containing joint through rates, filed with both the FMC and the ICC. At issue here are "Far East minibridge" tariffs, under which cargo loaded in containers moves by water between Far East ports and West Coast ports and by rail between rail terminals in West Coast port cities and East and Gulf Coast port cities. There is also a minibridge movement between the West Coast and Europe (Euro-Cal minibridge), and between the Gulf Coast and Europe (Euro-Gulf minibridge).

6. Far East minibridge and Euro-Cal minibridge are economically related. Because there is an imbalance of export-import cargo between the Far East and the East and Gulf Coast areas, these two services complement one another by utilizing containers for the movement of revenue-generating cargo in the opposite directions. Plaintiffs allege violations of NEPA only in connection with Far East minibridge.

*Administrative History.*

7. The Far East minibridge tariffs here involved were filed concurrently with the FMC and the ICC in accordance with the requirements of Section 18(b) of the Shipping Act, 1916 (46 U.S.C. § 817) and Section 6 of the Interstate Commerce Act (49 U.S.C. § 6). The first of these tariffs were filed on December 23, 1971 and became effective on January 24, 1972.

8. Shortly after the first Far East minibridge tariffs were filed, the Delaware River Port Authority (one of the plaintiffs here) filed a protest at the ICC asking the ICC to suspend the effectiveness of the tariffs under 49 U.S. C. § 15(7). The protestant alleged economic injury; no mention was made of environmental objections. The ICC refused to suspend the tariffs and per-

---

1. Japan Line, Ltd., Sea-Land Service, Inc., Phoenix Container Liners, Ltd., Seatrain Lines, Inc., Showa Shipping Company, Ltd., Kawasaki Kisen Kaisha, Ltd., The Atchison, Topeka and Santa Fe Railway Company, The Baltimore and Ohio Railroad Co., The Chesapeake and Ohio Railway Co., Erie Lacka-

wanna Railway Co., Lehigh Valley Railroad Co., Missouri Pacific Railroad Co., Norfolk and Western Railway Co., Penn Central Transportation Co., Southern Pacific Transportation Co., the Texas and Pacific Railway Co., Union Pacific Railroad Co., and Western Maryland Railway Co.

mitted them to become effective. No subsequent complaint or protest has been filed at the ICC.

9. The FMC has no suspension power over foreign commerce tariffs and is obligated to accept tariffs tendered in the form and manner prescribed by Section 18(b) of the Shipping Act, 1916. Once the Far East minibridge tariffs were judged acceptable in terms of form, they were automatically entitled to take effect 30 days from the date of filing.

10. On July 9, 1973, approximately one and one-half years after the first Far East minibridge tariffs became effective, three of the plaintiffs herein (Council of North Atlantic Shipping Associations, International Longshoremen's Association, AFL–CIO, and Delaware River Port Authority), along with others, filed a complaint with the FMC alleging that Far East minibridge operations were unduly injuring the economic interests of certain East Coast ports, in violation of Sections 15–18 of the Shipping Act, 1916, and Section 8 of the Merchant Marine Act of 1920. That complaint contains no reference to NEPA and does not allege any adverse environmental impact from minibridge operations. The State of Texas and the Commonwealth of Pennsylvania, also plaintiffs here, subsequently intervened. That proceeding, designated FMC Docket No. 73–38, has moved through initial pleading and discovery stages and the presentation of complainants' case.

11. On January 15, 1975, complainants in FMC Docket No. 73–38 made for the first time an allegation that minibridge movements adversely affect the environment.

12. On February 10, 1975, the FMC issued an order in Docket No. 73–38 in which it requested all parties to submit information "regarding predictable environmental effects resulting from the eventual resolution of this proceeding." The FMC explained the basis for this request as follows:

> The Commission believes that the nature of this proceeding renders any

decision hereon a major federal action significantly affecting the quality of the human environment. Consequently, the broad scope of environmental factors involved warrant most careful consideration and evaluation before decision making is undertaken.

The FMC is presently receiving comments from the parties in response to its request.

13. On March 21, 1975, some of the intervenors herein petitioned the FMC to reconsider its order of February 10. That petition is still pending.

14. There is also pending at the FMC a proceeding involving the Euro-Gulf minibridge tariffs which is similar to Docket No. 73–38. (Docket Nos. 73–42, 73–61, 73–69, 74–4). The complaints there involved are based solely on economic injury and not on violations of NEPA or adverse environmental impact. On February 24, 1975, the FMC issued an order in that proceeding which is similar to its February 10 order in Docket 73–38.

15. On March 18, 1975, the FMC issued a "Notice of Proposed Rulemaking —Policy and Procedures for Environmental Protection" (Docket No. 75–6), which was published in the "Federal Register" on March 24, 1975. The purpose of this proceeding is to establish general rules to ensure compliance by the agency with the requirements of NEPA. Comments on the proposed rules are due by May 8, 1975.

*Other Judicial Actions.*

16. On July 11, 1973 (two days after the filing of the complaint in FMC Docket No. 73–38), three of the plaintiffs here, along with others, filed a complaint in the U. S. District Court for the Eastern District of Pennsylvania (Civil Action 73–1560). Again, plaintiffs' arguments were based entirely on allegations that Far East minibridge resulted in undue economic injury to them, in violation of the Shipping Act, 1916, and the Merchant Marine Act (not NEPA). Plaintiffs' request for a pre-

liminary injunction contended that injunctive relief was required to "protect" the FMC's primary jurisdiction. The Court denied plaintiffs' request. Plaintiffs' request for a permanent injunction is still pending.

17. On July 2, 1974, two of the plaintiffs here, along with others, filed a similar complaint against Euro-Gulf minibridge in the U. S. District Court for the Eastern District of Texas (No. 74–202–CA). No allegations were made with respect to NEPA. The FMC and the ICC participated as *amici curiae*, supporting defendants. A preliminary injunction was issued on January 27, 1975, but has been stayed by the U. S. Court of Appeals for the Fifth Circuit pending appeal.

*Effects of Granting the Relief Requested.*

18. The intervenor-defendants submitted substantial evidence that Far East minibridge provides an alternative form of transportation which is of benefit to shippers. This evidence was not rebutted by plaintiffs. Through affidavits of shippers, intervenor-defendants showed that Far East minibridge (a) affords a shorter transit time over all-water service, (b) makes possible lower prices to consumers by reducing the time period during which goods must be financed and by permitting maintenance of inventories at lower levels than would otherwise be possible, and (c) reduces damage to the cargo moved. If this Court grants the relief requested and ends Far East minibridge movements, these benefits would be lost.

19. The shipper affidavits demonstrate that if Far East minibridge were terminated, some traffic presently moving by Far East minibridge might be diverted to other markets. Other traffic might continue to move to the same destination, but by alternative means which could be either more expensive or more time-consuming. A number of shippers stated that loss of Far East minibridge would make them less competitive or put them out of foreign markets entirely.

20. Two of the water carriers which intervened in this proceeding submitted unrebutted evidence they would suffer substantial injury through termination of minibridge. Seatrain indicated that it would lose profits of about $7,700,000 per year. Sea-Land indicated it would lose gross revenues (after the railroads' portion of minibridge revenue and after drayage expenses) of approximately $51,000,000 per year.

21. Unrebutted evidence submitted by the rail carrier intervenors indicated they would lose revenues of approximately $26,000,000 per year. Moreover, two of the affected rail carriers are presently in bankruptcy; loss of revenues to these carriers would be particularly serious. Substantial investments by railroads in specialized equipment for handling minibridge traffic would be jeopardized.

22. East and Gulf Coast ports would be expected to benefit economically by a suspension of Far East minibridge movements, but West Coast ports through which the traffic presently moves would be injured by like amounts. Similarly, longshoremen working in East and Gulf Coast ports (represented by the ILA) would benefit to the detriment of longshoremen working in West Coast ports (represented by the International Longshoremen Warehousemen's Union).

23. Further, intervenor-defendants have also shown that minibridge has a favorable effect on the U. S. balance of payments and on employment in the United States. Both of these benefits would be lost if the Court granted the relief requested.

*Environmental Impact.*

24. Plaintiffs' only allegations of adverse environmental impact are that the combined rail-water Far East minibridge movements, when compared to all-water movements, use more fuel and cause more air pollution. Plaintiffs

submitted two affidavits in support of those allegations. Plaintiffs' alleged source of pollution is limited to the rail portion of minibridge service. The intervenor-defendants submitted an affidavit which challenges the assumptions contained in plaintiffs' affidavits and concludes that the energy and environmental impact associated with Far East minibridge is less than that of all-water movement. This factual dispute need not be resolved at this time, but it should be noted that rail Far East minibridge traffic is an extremely small portion of total rail traffic and that plaintiffs make no environmental claims with respect to Far East minibridge traffic which do not also apply to all rail traffic. It is also to be noted that the Euro-Cal minibridge, which plaintiffs do not seek to enjoin, would appear to have the same environmental consequences, if any, as Far East minibridge.

### Conclusions of Law

■■ This is a Court of limited jurisdiction. The Court's jurisdiction to grant the extraordinary relief requested in a motion for a preliminary injunction is governed by the factors set forth by the Court of Appeals for the D. C. Circuit in Virginia Petroleum Jobbers Association v. Federal Power Commission, 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (1958):

(a) Has the petitioner made a strong showing that it is likely to prevail on the merits of its appeal?

(b) Has the petitioner shown that without such relief, it will be irreparably injured?

(c) Would the issuance of a stay substantially harm other parties interested in the proceeding?

(d) Where lies the public interest?

The Court concludes that plaintiffs have failed to meet their burden on *each* of these criteria.

*Likelihood of Prevailing On the Merits.*

■ For the following reasons, plaintiffs have not made the requisite showing that they are likely to prevail on the merits of their complaint.

A. Failure to Exhaust Administrative Remedies.

1. There is presently pending at the FMC a proceeding involving Far East minibridge tariffs (Docket No. 73–38) in which some of the plaintiffs here have raised the same question of adverse environmental impact which they have requested this Court to decide. On February 10, 1975, the FMC issued an order in Docket No. 73–38 whereby all the parties were directed to submit memoranda to the Commission within 45 days "which include their evaluations and positions regarding predictable environmental effects resulting from the eventual resolution of this proceeding." Some intervenor-defendants have asked the FMC to reconsider this action on the ground that no major federal action is involved. No final decision has been rendered by the FMC on the basis of its February 10 order. The matter is therefore pending before the Commission. Moreover, since defendants have filed a petition for reconsideration, it is clear that the Commission might conclude that there is no significant effect on the environment by accepting for filing the minibridge tariffs. The Commission might alternatively conclude that accepting for filing of the tariffs does not constitute major federal action. The defendants' motion for reconsideration is the first opportunity defendants have had to argue the environmental issue before the Commission. As the Commission's order of February 10 makes clear, the FMC is aware of its obligations under NEPA and intends fully to comply with them. For this Court to intervene at this time in the pending administrative proceeding would be unwarranted. This Court is foreclosed by the doctrine of exhaustion of administrative

remedies, McKart v. U. S., 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), and also the doctrine of the FMC's primary jurisdiction, Carnation Company v. Pacific Westbound Conference, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966), from assuming jurisdiction over the subject matter of this litigation. Both of these doctrines combine to prevent this Court's assertion of jurisdiction.

2. Of course, once plaintiffs have exhausted their administrative remedies, they must appeal any decision by the FMC to the U. S. Court of Appeals, not this Court. 28 U.S.C. § 2342.

B. No Basis for FMC to Reject Tariffs.

█ 3. The FMC statutory power to reject tariffs is limited to violations of the FMC's tariff filing regulations prescribing the form or manner of publishing or filing tariffs. The FMC does not have the authority to reject tariffs on any basis other than the essentially technical requirements set forth in Section 18(b) of the Shipping Act, 46 U.S.C. 817(b)(4). Tariffs which satisfy these ministerial requirements become effective thirty days after they are filed. Since it appears the FMC does not have authority to reject tariffs on grounds other than those established by the Shipping Act, the FMC's authority to reject tariffs on environmental grounds is doubtful. The propriety of a court order directing the FMC to reject the tariffs on non-statutory grounds is equally doubtful.

██ 4. Further, even if there is an inconsistency between NEPA's requirements and the Shipping Act, plaintiffs have failed to show that the former would control. By its own terms, NEPA applies only "to the fullest extent possible." Agencies are exempted from compliance with NEPA when compliance would give rise to agency violation of statutory obligations. Environmental Defense Fund v. Tennessee Valley Authority, 468 F.2d 1164 (6th Cir. 1972).

The FMC is bound to accept tariffs in the foreign commerce that otherwise meet the regulations issued pursuant to the statute. 46 U.S.C. 817(b)(4). If NEPA procedures conflict with this duty, the NEPA procedures might have to yield. Atlanta Gas Light Co. v. Federal Power Commission, 476 F.2d 142 (1973). A preliminary injunction should not be issued in the face of the substantial question raised regarding the applicability of NEPA to the FMC's actions in this case.

C. No Jurisdiction to Suspend ICC Tariff.

█ 5. In Arrow Transportation Company v. Southern Railway Co., 372 U.S. 658, 83 S.Ct. 984, 10 L.Ed.2d 52 (1963), the Supreme Court held that the ICC has exclusive jurisdiction to enjoin tariffs on file with it. The ICC may decide to suspend or not to suspend a tariff and the courts have no jurisdiction to review that determination. The action is discretionary with the Commission under the Interstate Commerce Commission Act, 49 U.S.C. 15(7). Identical minibridge tariffs are on file with the ICC and the FMC. An injunction halting minibridge service will affect railroads operating under valid ICC authorizations as well as FMC regulated water carriers. This result is precluded by United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 692, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973):

> The injunction constitutes a direct interference with the Commission's (ICC's) discretionary decision whether or not to suspend the rates. It would turn *Arrow* into a sheer formality and effectively amend § 15(7) if a federal court could accomplish by injunction against the Commission what it could not accomplish by injunction directly against the railroads.

The basis of the *Arrow* decision—that to permit interference with the Commission's suspension procedures would invite the very disruption in the orderly review of the lawfulness of proposed

tariffs that Congress meant to preclude —applies with equal force to this case and raises substantial questions as to the likelihood of plaintiffs winning on the merits.

D. Laches.

6. NEPA became effective on January 1, 1970. Over three years have elapsed since the first minibridge tariffs were filed. At the time of filing and at all times since, plaintiffs have had the opportunity to voice any environmental objections to either the ICC or the FMC. They did not do so until January, 1975, despite numerous opportunities to raise the issue in administrative and judicial proceedings initiated by them in opposition to minibridge movements. The doctrine of laches applies to cases arising under NEPA. *See,* in this regard, Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1971). In view of the failure of plaintiffs to raise environmental issues for more than three years and the actions by others during this time in reliance upon the lawfulness of minibridge tariffs, the doctrine of laches raises serious questions as to the likelihood of plaintiffs winning on the merits.

*No Irreparable Injury to Plaintiffs.*

7. Plaintiffs have failed to meet the second criterion of *Virginia Petroleum Jobbers Association, supra,* in that there has been no adequate showing of irreparable injury.

8. The environmental impact of the Euro-Cal and Far East minibridge service is similar. Because plaintiffs generally have accepted the benefits of the Euro-Cal minibridge, as contrasted with the Far East minibridge, this Court determines that the objection to these particular tariffs is not environmental but in fact is economic.

9. There has been no adequate demonstration of any physical harm or injury to health, to plant life, to wildlife, or to any other environmentally protected aspect of human environment from minibridge.

*Injury to Other Parties.*

10. Substantial, unrebutted evidence was presented by defendants, intervenor-defendants and *amici curiae* of irreparable injury to these parties should the preliminary injunction be granted. This injury includes injury to shippers (through elimination of a desirable alternative transportation mode and possible increases in expense and shipping time) and to water-carriers and rail-carriers (through lost revenues and investment in specialized equipment).

*Public Interest.*

11. In addition to the potential injuries to individual shippers and carriers referred to above, substantial evidence was presented that the interests of the nation would not be served (through adverse effects on employment, the balance of payments and undue disruption of established commercial patterns) if the Court were to grant the relief requested. The injury to the public is not outweighed by the benefits sought by a relatively small group who, for reasons of their own, are perfectly willing to live with the Euro-Cal minibridge but object to these Far East tariffs, which were filed shortly after the Euro-Cal tariffs over three years ago, and which also utilize rail service.

*Other Issues.*

12. Defendants and intervenor-defendants have raised a number of additional issues, including the standing of plaintiffs, failure to join indispensable parties, failure to state a claim, and the doctrine of unclean hands. In view of the conclusions stated above, it is not necessary for the Court to reach those issues.

*Conclusion*

For all of the foregoing reasons, plaintiffs are not entitled to the relief requested. Plaintiffs' motion for preliminary injunction is denied, judgment is entered against the plaintiffs and in

favor of the defendants and intervenor-defendants, and the action is dismissed. An order consistent with the foregoing has already been entered.