**IOWA STUDENT PUBLIC INTEREST RESEARCH GROUP (ISPIRG) et al., Plaintiffs,**

**v.**

**Howard H. CALLAWAY, Secretary of the Army, et al., Defendants.**

**Civ. No. 74-8-2.**

United States District Court, S. D. Iowa, C. D.

Feb. 26, 1974.

contract involving Phase III of the construction of the Saylorville Dam Project whereby trees, brush, and fences would be removed from the permanent pool area of the dam site in preparation for closure of the dam in the summer of 1974. The plaintiffs wish to halt this project pending the release of the final environmental impact statement.

The plaintiffs have alleged that the:

Clearing and destruction of the trees, and further construction, would have an adverse effect on the environment of the plaintiffs which would be avoided by and in an alternative presently under consideration pursuant to NEPA. One such alternative under study is discontinuance of the project all together.

"That the issuance of a notice to proceed by the defendant [on the clearing contract] and subsequent commencement of demolition of such trees pursuant to the contract above cited, irretrievably blocks any realistic appraisal of the alternative being considered, and renders the consideration of such alternative an exercise in futility."

The plaintiffs prayed for a temporary restraining order restraining the defendants from issuing any notice to proceed on the clearing contract. The plaintiffs also pray for preliminary and permanent injunctive and declaratory and request this Court to:

"Permanently enjoin defendants from pursuing any activity or project, contract or work order, or activating or sponsoring, any project which conflicts, limits, precludes, or in any way hinders, a realistic appraisal of all considered alternatives as contained in the Draft Environmental Impact Statement as herein filed, until such time as subsequent to the filing of the Final Environmental Impact Statement."

The plaintiffs also pray that the Court enter a judgment declaring the defendants' actions in pursuing and in continuing the Saylorville Dam Project

Gordon E. Allen, Des Moines, Iowa for plaintiffs.

Allen L. Donielson, U. S. Atty., and Keith E. Uhl, Asst. U. S. Atty., Des Moines, Iowa, for defendants.

## MEMORANDUM AND ORDER

HANSON, Chief Judge.

This cause of action arises under the National Environmental Policy Act (NEPA), 42 U.S.C., Section 4321 et seq. Jurisdiction of this Court is invoked pursuant to 5 U.S.C., Sections 701 et seq.; 28 U.S.C., Section 1362; 28 U.S.C., Section 1331; 28 U.S.C., Section 1337; and 28 U.S.C., Sections 2201 and 2202.

### I.

The plaintiffs are seeking to restrain the defendants from proceeding with a

to be in violation of the provisions of the National Environmental Policy Act, 42 U.S.C., Sections 4321 et seq.

On the 11th day of January, 1974, this Court entered a Temporary Restraining Order restraining the defendants from issuing any written Notice to Proceed to contractors relating to the clearing or removal of trees within the project area pending a full hearing upon preliminary injunctive relief.

The immediate effect of the TRO was to delay notice to proceed on a contract awarded on December 28, 1973 for $639,000. General provisions of this contract were for the removal of trees, brush and fences only in the conservation pool [the permanent lake] of the Saylorville Project. This would be a maximum elevation of the permanent conservation pool. [The additional three foot clearance is for a freeboard requirement.] The clearing contract covers an area of 1,618 acres consisting of 550 acres of brush, and the remainder of trees.

On February 7, 1970 this Court held a hearing at which both parties agreed that this cause could be fully submitted as it relates to the Motion for Summary Judgment filed by the defendants and injunctive and declaratory relief for the plaintiffs. This Court received evidence in the form of affidavits and live testimony which both parties agreed could be accepted by the Court for the determination of both Summary Judgment and declaratory and injunctive relief. The Court considers this matter to be submitted upon the merits at this time.

## II.

The Saylorville Dam Project is a multi-purpose project for flood control, low-flow augmentation, fish and wildlife management and recreation, located on the Des Moines River, a tributary of the Mississippi River, in Polk, Dallas and Boone Counties, Iowa, approximately 5.5 miles above the city of Des Moines. The first surveys of flood damage in the Des Moines River basis which ultimately led to the project began in the 1940's. The various studies and surveys culminated in a report submitted to Congress later identified as Senate Documents No. 9 85th Congress First Session and was filed with Congress in 1955. Subsequently the Saylorville Lake Project was authorized by Congress in the Flood Control Act of 1958. The first designing of the project began in 1959 with Congress first appropriating money for the project in 1960. There have been yearly appropriations from Congress since 1960.

The Saylorville Dam, as planned, is an earth embankment dam with a length of 6,750 feet and a height above sea level of 915 feet, with an average height above the valley floor of 105 feet. The dam at its top is 44 feet wide and the average bottom width is 870 feet. The conservation pool is planned at 833 feet m. s. l. with a maximum flood pool at elevation 890 feet.

The construction of the dam itself was divided into three stages. Stage I consisted of construction of about one-half the total length of the dam from near the west abutment to a point near the Des Moines River, about one-half the total height, and excavation of most of the spillway channel. Stage I construction was completed in 1960 at a cost of about 1.8 million dollars.

Stage II construction consisted of the construction of the control structure, conduit, spilling basin, concrete spillway structure, excavation of the portion of the approach and discharge channels, construction of a dam embankment to tie into the west abutment, and excavation of the remainder of the spillway channel. This construction was completed in April, 1971 at a cost of 4.9 million dollars.

Stage III of the construction consists of an additional 55 feet of fill on top of Stage I and Stage II construction, and making the permanent river closure completing the entire dam. A contract for construction of Stage III

was awarded on December 29, 1972. Stage III construction is under present scheduling and is to be completed in 1975. The closure of the river is scheduled to occur in the summer of 1974.

The clearing contract for clearance to the 836 foot level, which is the subject of this lawsuit, was awarded on December 28, 1973 after an invitation for bids on November 20, 1973 and bid opening on December 20, 1973. The contractor's performance and payment bonds and executed contract document were received on January 16, 1974. The Corps of Engineers could not issue notice to proceed due to the temporary restraining order.

The Saylorville Dam Project is estimated to cost a total of $72,500,000, of which approximately $48,000,000 has been expended to date. Expressed in percentage terms, the project is approximately 66 percent complete.

### III.

In the planning of a Corps of Engineers water resources project, master plans are prepared for the Corps of Engineers for each project. The initial step in the process of developing an Environmental Impact Statement or a master plan is essentially the same. This step constitutes the gathering of basic data concerning natural and cultural elements within the environment of the project area. The planning of the type of projects engaged in by the Corps of Engineers has necessarily involved the consideration of the environment even before passage of the NEPA.

With reference to the Saylorville Lake Project this initial data gathering process was a master plan started as early as 1960. The first study culminated in the preparation, submission and approval of a preliminary master plan, approved December 12, 1962 as Design Memorandum No. 6A. This was many years before the effective date of the National Environmental Policy Act in January, 1970.

In January of 1970, many of the Rock Island District of the Corps of Engineers had approximately 60 projects which would require the preparation of an EIS, one of which was the Saylorville Lake Project. The status of these projects varied and, as related to funding, social-political aspects, and other factors, the active projects received various levels of priority within a given work schedule. The scheduling of an EIS preparation was related to project status.

The Corps of Engineers Regulation No. ER–1105–2–507, required each district of the Corps of Engineers to establish a three-year priority schedule. Under this directive the draft environmental impact statement for the Saylorville Lake Project was initially scheduled to be completed in June 1972. Due to the fact that there was insufficient manpower and/or resources, this original schedule could not be met. Although the extent and scope of additional manpower needs were recognized with the enactment of NEPA, staffing of personnel with the necessary expertise was not immediately possible. An administrative freeze on federal hiring compounded the personnel problem. It was not possible to meet the original June 1972 schedule for the completion of the draft environmental statement, although environmental data was being gathered for the master plan which could also apply to the EIS.

While the Corps of Engineers was continuing its work on the environmental impact statement for the Saylorville Lake Project, the first suit for injunctive and declaratory relief, Civil No. 72–285–2 was brought.

On December 1, 1972 the Iowa Citizens to Save Ledges State Park, Iowa Citizens for Environmental Equality, the Sierra Club, and certain individual plaintiffs filed a complaint for Injunction and Declaratory Relief in this Court in Civil No. 72–285–2 against the Secretary of the Army and other defendants. This Court in that case issued a temporary restraining order pro-

hibiting defendants from awarding contracts on Stage III construction of the Saylorville Dam until December 24, 1972 but permitted bid opening to proceed on December 5, 1972.

On December 20, 1972 the parties to that previous litigation entered into an arrangement by stipulating[1], providing, among other things, that plaintiffs herein would not thereafter seek preliminary or injunctive relief to stop Stage III, or any other construction or work of the Saylorville Lake Project with certain exceptions not here material. During the negotiation of the agreement, the clearing of trees was discussed and agreed as work which would not be stopped. The stipulation and agreement was approved and adopted by order of this Court filed December 21, 1972 in said cause. Stage III construction is now proceeding pursuant to the agreement and Order of the Court.

This prior litigation by the nature of the stipulation, did not anticipate discontinuance of the Saylorville Dam Project, but instead contemplates that the project will be completed. The main thrust of that litigation was to examine ways to minimize the environmental damage of the completed project especially as it relates to Ledges State Park.

The Army Corps of Engineers has proceeded with the project and the Environmental Impact Statement in accordance with that stipulation. This Court retains jurisdiction of Civil No. 72–285–2 pursuant to the stipulation.

A draft environmental impact statement was completed and issued on July 6, 1973. Copies of the draft statement were sent to state and federal agencies and other interested parties. Copies for the general public were sent to the ten public and university libraries nearest the project area. As expiration of the comment period approached, a minimum 45 day review period following the release of the draft EIS, demands for a 60 day extension were made by ISPIRG, one of the plaintiffs in this lawsuit. The rec-

ord indicates that the Corps of Engineers was reluctant to grant this demand for an extension because it would delay the entire environmental impact statement preparation schedule but did so in order that citizens of Iowa could have maximum input regarding the EIS.

The Corps of Engineers set September 26, 1973 for a public meeting and extended the comment period, in spite of the delay caused by the request of the plaintiff. This extension delayed the environmental impact statement by approximately four months, the delay consisting of the period from August 25, 1973, which would have been the end of the minimum 45 day review period, until October 15, 1973, when the Corps of Engineers received the transcript of the public meeting and had time to respond to the additional comments. The defendants represent that the final EIS should be filed with CEQ by May 1, 1974 after leaving the District Corps office by March 1974 and then being processed by The Department of the Army.

## IV.

The immediate thrust of the plaintiffs complaint is to halt the performance of the contract for removal of trees, brush and other matter in the permanent conservation pool of the dam until after release of the Final Environmental Impact Statement. It is clear from the evidence that delaying this contract for tree removal would delay the completion of this project for at least one year.

The clearing of the permanent conservation pool, the area which will be continuously under water, must be completed contemporaneously with the dam closure and before the impoundment of water in the permanent conservation pool begins. Failure to complete the clearing of the conservation pool before impoundment of water would make it difficult, if not impossible, to perform such clearing and would create adverse environmental conditions with dead and decaying trees and vegetation, visual pollution, hazards to

1. See stipulation attached as Exhibit A.

boaters, and blockage of the outlet works of the dam, increasing the likelihood of overflow of the uncontrolled spillway and downstream flooding.

Winter time is the best time for performing heavy timber clearing because the frozen ground facilitates access and movement of heavy equipment and reduces environmental damage through disturbance of the soil and erosion. If the clearing contract is enjoined and delayed so that it cannot be commenced and substantial progress be made this winter, it will be delayed until the fall and winter of 1974–75. Because of the restrictions on dam closure, an injunction regarding the clearing of the trees of the 833 foot level would delay the entire project for at least one year.

The closure must be made on or about July 1, 1974 so that sufficient time is remaining in the 1974 construction season to put fill on top of the closure to prevent erosion and washout of the dam by the spring 1975 high river levels. Timing for the closure is on a tight schedule and the clearing of the trees to the 833 foot level is an imperative as a complementary action to the closure of the dam.

Damages to the defendants, by causing a possible breach of the clearing contract which has been awarded, by failure to issue the notice to proceed and costs for delay of the project are great. The cost to the government of halting the entire project for one year would be approximately $13,000,000. If the project is halted temporarily, the daily cost would be approximately $28,000 per day.

## V.

There are immense problems imposed upon the Corps of Engineers and other agencies with the imposition of the NE PA upon ongoing projects. In this instance the Corps of Engineers upon the filing of Civil No. 72–285–2 reached an accommodation with the plaintiffs in that cause to allow the project to proceed and also to allow for preparation of an EIS and the resulting consideration of the environment as it relates to the completion of the project.

The plaintiffs have been aware of the status of this project and the prior stipulation entered in Civil No. 72–285–2 for some time last past. The plaintiffs are also sophisticated enough to know that the thrust of that stipulation was that the project *was to be completed* and that the possibility of limiting adverse environmental consequences in the completion of the project were to be considered in the preparation of the EIS.

The plaintiffs have participated extensively in giving input to the Environmental Input Statement which is being prepared in accordance with that prior stipulation knowing that the thrust of that stipulation was to allow the completion of the project with the examination of ways of minimizing adverse environmental consequences.

Now after many millions more have been invested in this project, the present plaintiffs bring this suit challenging the very existence of the project.

At the filing of this lawsuit more than $48,000,000 has been spent in completing two-thirds of this project. Significant changes in the environment have taken place to this point in time. It is clear to this Court from the evidence in this cause, that if there is to be a Saylorville Dam, the trees, brush and other matter in this contract must be removed from the permanent pool area. To halt the clearance of trees contract would invoke immense expense to the defendants and the public in the delay to a project no one seriously doubts will be eventually completed.

This Court will not allow, nor does it believe that Congress intended a plaintiff, after inexcusable delay, to file and request injunctive action to the prejudice of other parties, and after the expenditure of millions of dollars of public funds. In determining that this action is barred by laches, this Court has examined all the existing circumstances and found that the delay was unreasonable and did cause prejudice to the adversary.

While the Court recognizes that no certain time period has been established which will give rise to the defense of laches, in this case there has been no diligence on the part of the plaintiffs and the delay was not reasonable under the circumstances.

The plaintiffs have slept on their rights. The plaintiffs could have easily instituted this law suit from January 1, 1970 when NEPA was enacted, but more specifically when the original Ledges lawsuit, Civil No. 72–285–2, was filed on December 1, 1972[2] when the draft environmental impact statement was circulated on July 6, 1973 when the public meeting was held on September 2, 1973, or when the clearing contract in question was advertised even at a later date. If the plaintiffs have been proceeding on an assumption as evidenced by this suit, contrary to that of the stipulation in 72–285–2, to-wit, that the dam would not be completed, they should not have waited until the final stages of the project after additional millions of public funds have been expended before attacking the very existence of the dam.

The plaintiffs have waited until the awarding of the clearing contract at a time when the project is 66 percent completed after passing up with knowledge the date of the enactment of NEPA, the date of the original lawsuit, the date of the circulation of the draft environmental impact statement, the date of the public meeting, and the date of the initial advertising for the clearing contract.

■ As is the case regarding injunctive relief, the decision whether laches bars an action depends upon the circumstances and is addressed to the discretion of the trial court. See Burnett v. N. Y. Central RR Co., 380 U.S. 424, 85 S.Ct. 1050, 13 L.Ed.2d 941 (1965), and

Gardner v. Panama R. Co., 342 U.S. 29, 72 S.Ct. 12, 96 L.Ed. 31 (1951).

In the case before the Court the equitable doctrine of laches should be applied as it would be inequitable to permit plaintiffs to proceed in this matter. As Justice Frankfurter held in Holmberg v. Armbrecht (1946), 327 U.S. 392, at 396, 66 S.Ct. 582, at 584, 90 L.Ed. 743:

> Equity eschews mechanical rules; it depends on flexibility. Equity has acted on the principle that 'laches is not, like limitation, a mere matter of time; but principally a question of the inequity of permitting the claim to be enforced,—an inequity founded upon some change in the condition of relations of the property or parties.' Galliher v. Cadwell, 145 U.S. 368, 373, 12 S.Ct. 873, 875, 36 L.Ed. 738; see Southern Pacific Co. v. Bogert, 250 U.S. 483, 488, 489, 39 S.Ct. 533, 535, 536, 63 L.Ed. 1099.

See also Clark v. Volpe, 342 F.Supp. 1324 (E.D.La.1972), aff'd, 461 F.2d 1266 (5th Cir. 1972).

The equitable doctrine of laches as relating to NEPA cases was recognized in Lathan v. Volpe, 455 F.2d 1111 (9th Cir. 1971) where the plaintiff sought to halt all further acquisitions of real property by state highway officials in connection with a proposed interstate highway until the provisions of NEPA were adhered to by the defendants. In that case, the specific deficiency was that no environmental impact statement had been prepared and submitted as required by the Act. The Court recognized the two essential elements of laches as (1) lack of diligence by the plaintiff, and (2) injurious reliance thereon by the defendant. See Lathan v. Volpe, supra, at 1122. Both elements are present here.[3]

---

2. The Executive Director of the Iowa Student Public Research Interest Group who is one of the individual plaintiffs, testified at the time of hearing that the group was aware of the original lawsuit filed on December 1, 1972, but stated they did not join that lawsuit as ISPRIG was not interested in the Saylorville Project action at that time.

3. This Court has reviewed the various NEPA related cases regarding laches and the annotation at 17 A.L.R.Fed. 33, 153 and remains convinced that in this situation plaintiffs' action is barred by the defense of laches.

■ There has been detrimental reliance on the part of the defendants in this case both in the awarding of the construction contract and in the continuation of the building of the Saylorville Dam since the stipulation entered into on December 20, 1972 in the earlier litigation. The Corps of Engineers has proceeded since the entry of that stipulation to consider the environmental impact of the project while continuing the project itself. This Court does not believe that Congress intended to halt all on-going projects by the passage of the NEPA. The former accommodation worked out between environmentalist and the Corps proceeded in a sensible way regarding an on-going project. The plaintiffs have allowed the Corps of Engineers to proceed in reliance upon the prior stipulation and expend millions in funds and to substantially alter the environment before they finally instituted this lawsuit.

Moreover, any natural reluctance to automatically impose the rule of laches to the prejudice of an uninformed group of plaintiffs does not obtain here, where in the instant case the action is brought in the name and sponsored by a state wide public interest group and individuals' knowledgeable in the area of environmental litigation, the events regarding the Saylorville Lake Project and active in ISPRIG activities.

■ Therefore, the issue before the Court reduces itself to the proposition: Should the plaintiffs be able to delay bringing the action for more than four years after the enactment of NEPA and more than one year after the initial litigation on the Saylorville Dam, and still be able to gain relief despite detrimental reliance and financial prejudice to the defendants and to the public. This Court answers in the negative and holds that the plaintiffs should not be given this option and must be held estopped to maintain this action by reason of the doctrine of laches.

## VI.

■ Even if this Court had not held that the plaintiffs cause of action is barred by laches, the Court would still conclude that injunctive relief in this cause is inappropriate. The Court finds that the intent of the statute is not to provide an automatic injunction where an Environmental Impact Statement is not completed to date. As it relates to an on-going project which is substantially complete at high cost at the time of filing of the suit for injunction, the Court must consider the circumstances as it relates to the scope of the requirement for the EIS and the necessity of its completion before the project can be permitted to proceed.

As stated in Environmental Defense Fund, Inc. v. Froehlke, 477 F.2d 1033 (8th Cir. 1973) at 1037:

"A trial court must consider all the circumstances in determining whether a project may be. permitted to proceed pending the completion of an E.I.S. See, Environmental Defense Fund, Inc., et al. v. Robert F. Froehlke, Secretary of the Army, et al., 473 F.2d 346, at 356, n. 21 (8th Cir. 1972). We recognize that the injunction is the vehicle through which the congressional policy behind NEPA can be effectuated, and that a violation of NEPA in itself may constitute a sufficient demonstration of irreparable harm to entitle a plaintiff to blanket injunctive relief. See, Environmental Defense Fund, et al. v. Tennessee Valley Authority, et al., 468 F.2d 1164 (6th Cir. 1972); Environmental Defense Fund, Inc., et al. v. Robert F. Froehlke, Secretary of the Army, et al., No. LR–71–C–199 (E.D.Ark. March 8, 1973).

Here, we find that the trial court did not abuse its discretion in granting limited injunctive relief. The record bears out the trial court's finding that the river and life within it would not be harmed while the E.I.S. was being completed, and that only minimal en-

vironmental damage would be inflicted on the adjacent land during that period. Moreover, the record supports the trial court's finding that the road relocations had insignificant environmental effects and had independent economic benefits.

The record also supports the trial court's conclusion that substantial additional costs would be incurred by the defendants if they were forced to discontinue the project and restart it at a future date. It also convinces us that the amount of money projected to be spent on the project in the intervening period is not sufficient to affect the balance of costs and benefits that must be struck by the defendants and other decision-makers in determining whether or not to continue this project after the final E.I.S. is filed.

In short, we are persuaded that this is not a case where, unless the plaintiffs receive now whatever relief they are entitled to, "there is [a] danger that it will be of little or no value to them or to anyone else when finally obtained." Lathan v. Volpe, 455 F.2d 1111, 1117 (9th Cir. 1971)."

Similarly, as stated by Judge Eisele in Environmental Defense Fund, Inc. v. Corps of Engineers, 342 F.Supp. 1211, 1217 (E.D.Ark.1972) ;

> The Court does not believe that the Congress intended that the NEPA be used as a vehicle for the continual delay and postponement of legislative and executive decisions.

The Court recognizes the declared policy of Congress in the passage of the National Environmental Policy Act, but also recognizes the difference in the degree of applicability of that statute to a new project as opposed to a project which was authorized some twelve years prior to the effective date of NEPA, with construction commencing five years prior to NEPA.

A balancing of interest is contemplated. As stated in Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission, 146 U.S. App.D.C. 33, 449 F.2d 1109, 1112 (1971) :

> Congress did not establish environmental protection as an exclusive goal; rather, it desired a reordering of priorities, so that environmental costs and benefits will assume their proper place along with other considerations.

Complete stoppage or discontinuance of a project which is at the advanced stage of completion as this one is in most instances is not a reasonable alternative which needs to be seriously considered. The Government must consider principally amelioration of the environmental impact of further project construction.[4]

The guidelines issued by the Council on Environmental Quality, a NEPA-created entity, also emphasize minimization of adverse environmental consequences on projects where it is impractical to reassess the basic course of action.

> "To maximum extent practicable the Section 102(2). (C) procedure should be applied to further major federal actions having a significant effect on the environment *even though they*

---

4. It remains important that further incremental major action be shaped so as to minimize adverse environmental consequences and as the regulation states, it is also important to take into account environmental consequences not fully evaluated at the outset of the project or program. However, if the spirit of NEPA is to be followed, it would seem a wiser course of action to allow administrators responsible for the preparation of environmental impact statements to direct their limited resources toward the creation of a study which could be used as an effective decision-making tool. When a project is substantially completed, and its benefits as in this case are apparent in the areas of flood control, low flow river augmentation, fish and wildlife management, and recreation, and large amounts of public funds have been expended, discontinuance of the project is not a serious feasible alternative. It may be theoretically true that failure to state discontinuance of the project as an alternative omits a choice but this Court applying the standards of a real world would prefer to see an environmental impact statement to be part of an integrated decision-making process rather than a wholly groundless attempt or exercise in injunctive relief.

*arise from projects or programs initiated prior to enactment of the Act* on January 1, 1970. Where it is not practicable to reassess the basic course of action, it is still important that further incremental major actions be shaped so as to minimize adverse environmental consequences. It is also important in further action that account be taken of environmental consequences not fully evaluated at the outset of the project or program". 36 Fed.Reg. 7724 (April 23, 1971) (Emphasis added.)

The plaintiffs' allege that if limited tree clearing occurs the demolition of those trees irretrievably blocks any realistic appraisal of the alternatives being considered for the Saylorville Lake Project. Their Complaint stresses that the alternative, which will then no longer be realistic, is discontinuance of the project or no dam.

The government did not argue that discontinuance of the entire Saylorville Project is not a feasible alternative. However, in light of the plaintiffs' claim that limited tree and brush clearing will mean the non-consideration of the "discontinuance of the dam" alternative, it is noted that the Saylorville Project as of December 31, 1973 was already 66.3 percent completed with $48,090,100 expended out of the total estimated cost of the project of $72,500,000.

The Court concludes that in reality discontinuance of the dam is not a serious alternative and that to impose huge costs upon the public to keep this option more open given that it has, in essence, already been foreclosed would work a grave injustice.

In accordance with the foregoing memorandum, it is ordered that the plaintiffs are barred from proceeding with this cause of action for injunctive relief by the doctrine of laches.

It is further ordered that injunctive relief is to be denied because of the great loss and inconvenience to the defendants and the public if such relief is granted and because of the lack of seri-

ousness of a proposal to discontinue the Saylorville Dam Project at this stage.

It is further ordered that this cause of action is dismissed.