**MOORE BUSINESS FORMS, INC., Plaintiff,**

v.

**Glenda K. WILSON, Defendant.**

**MOORE BUSINESS FORMS, INC., Plaintiff,**

v.

**Michael D. WILSON, Defendant.**

Nos. C95–0392, C95–0393.

United States District Court, N.D. Iowa, Cedar Rapids Division.

Oct. 18, 1996.

Robert E. Konchar, Kevin J. Visser, Stanley M. Herkelman, Moyer & Bergman, P.C., Cedar Rapids, IA, for Plaintiff Moore Business Forms, Inc.

Roger W. Stone, Simmons Perrine Albright & Ellwood, Cedar Rapids, IA, J. Jackson, Dorsey & Whitney, Minneapolis, MN, for Defendant Glenda K. Wilson and Michael D. Wilson.

James E. Bennett, Peter C. Riley, Tom Riley Law Firm, Cedar Rapids, IA, for Plaintiff Ronald Nelson, Brenda Nelson and Lynn Brunsman and Karen Brunsman.

Charles T. Patterson, Margaret M. Prahl, Eidsmoe Heidman Redmond & Fredregill,

Sioux City, IA, for Defendant DeKalb Swine Breeders, Inc.

## CORRECTED OPINION and ORDER

MELLOY, Chief Judge.

This matter is before the court on the plaintiff, Moore Business Forms, Inc.'s, Motion for Preliminary Injunction (docs. # 1), filed December 8, 1995 in each of the above captioned actions. Moore seeks a preliminary injunction to enjoin the defendants, Michael and Glenda Wilson (former Moore sales representatives), from violating restrictive covenants in the defendants' employment agreements. This order grants that motion, in part, for the reasons and to the extent set out below.

### Background

The defendants, Michael and Glenda Wilson, were sales representatives for the plaintiff, Moore Business Forms ("Moore") until April 1995 when they resigned their positions and entered into agreements with American Business Forms ("ABF") to act as sales representative for its line of products.[1] Moore manufactures and sells a full line of business forms and related products. Moore, along with Uarco and Standard Register, is one of the three major manufacturers and suppliers in the highly competitive business forms industry. In addition to the major manufacturers, there are a number of smaller independent operators, including ABF, competing for customers. Whereas the major suppliers, such as Moore, manufacture and print their own products primarily at company owned plants, independent operators, such as ABF, typically supply their sales representatives with access to independent printing companies located in the representative's territory who produce the forms locally, often at significant savings over the major manufacturers. Since resigning from Moore, the defendants have sold ABF products under an independent contractor agreement. Moore seeks to enjoin the Wilsons from selling ABF forms to their former Moore clients, alleging that such sales violate the terms of restrictive covenants contained in their employment agreements.

Moore hired Michael and Glenda in 1974 and 1978, respectively, despite their complete lack of experience in and knowledge of the business forms industry. Throughout their careers at Moore, the Wilsons received extensive, specialized training related to sales, marketing, customer relations and new products in order to maximize their ability to apply Moore's products to their customers' operations. This training helped prepare them for their sales assignments and to perform their duties successfully. With Moore's support, the Wilsons both promoted, developed and carried on Moore's business as its primary contacts with the customers assigned to them.

At the outset of their employment with Moore, both Michael and Glenda entered into an employment agreement with Moore which included the restrictive covenants at issue in this case. In addition, the defendants signed subsequent employment agreements periodically throughout their career, most recently in 1993. Each of those agreements contained the same restrictive covenants. Pursuant to the employment agreements, Michael and Glenda were assigned as sales representatives for Moore, and each one was assigned to service specific customer accounts. The restrictive covenants at issue purport to restrict the Wilsons' ability to compete with Moore for a period of two years following the termination of their employment. Specifically, the covenants state that the Wilsons may not, for a period of two years, "directly or indirectly on [their] own behalf, or on behalf of anyone else, ... solicit, sell or contract, with a view to selling any [business forms or related products] or service, any person, firm, or corporation from whom [they] sold any product or service or otherwise dealt with during the *one year* preceding" the end of their employment with Moore.[2] Moore requests an order enjoining

---

1. The Wilsons now do business through a closely held company, Solutions Ink, L.C. d/b/a American Business Forms, Inc. ("Solutions"), which they formed shortly after resigning from Moore.

Glenda and Michael are the only two employees of Solutions.

2. The plaintiff is not attempting to enforce a second, more onerous restriction, which would

the defendants, for a period of two years, from selling to any of the customers they dealt·with during the one year prior to terminating their employment at Moore.

Michael and Glenda resigned from Moore on April 19, 1995 and April 21, 1995, respectively. Prior to their resignation, and while still employed by Moore, the Wilsons took steps which appear to have been geared toward enhancing their ability to compete directly with Moore. For example, during the months prior to his resignation, Michael made disparaging statements about Moore in front of Deere & Company employees at various functions (Deere & Company is one of Moore's national accounts and was assigned to Michael during the one year prior to his resignation.). In addition, Michael held a number of "closed door" sessions with Deere executives during the days immediately prior to his resignation. He requested a print-out of the prices, quantities and dates of Deere's orders for the previous year (a list that is routinely only made for year end reviews) and went over the list with Greg Clearman of Deere on his last day. Michael admits that he told several Deere employees, including Greg Clearman, Al Peers and Jan Ryden, that he was planning to leave Moore before he tendered his resignation. Although Michael denies that he advised Deere that he was going to begin selling a competing line of business forms, ·the Court views his actions during his last days at work as indicative of an attempted solicitation for future business. In addition, the Moore sales representative who was assigned to take over most of the accounts that had previously been serviced by Glenda Wilson reported that his job was hindered by the fact that all of the pricing and related information for her former accounts had been erased from the memory of the hand-held computer that she turned over to him.

The restrictive covenants apply only to accounts that Michael and Glenda serviced during their final year with Moore. Although between the two of them, the Wilsons serviced a number of different clients during their final year, the analysis may be simplified by grouping those accounts into three general categories: Michael's key account; Glenda's key accounts; and other smaller accounts. Michael's key account, as discussed above, was John Deere. Glenda Wilson's key customers, customers with whom Moore did a significant amount of business during her last year, include Crescent Electric Supply, Flexsteel Industries, Inc., Finley Hospital, Mercy Hospital in Iowa City, Mercy Health Center in Dubuque, Samaritan Hospital in Clinton, and United Clinical Labs. For the purposes of assessing the propriety of imposing a preliminary injunction, the Court will treat each of these categories separately.

Prior to 1993, Michael Wilson's primary client was CyCare Systems. He lost that account when he was underbid by a competitor. Soon afterward, in an effort to accommodate Mr. Wilson, Moore reassigned him to their John Deere account with whom Moore does more than $2,000,000 of business annually. John Deere is a national account with whom Moore has an exclusive sales agreement covering the John Deere headquarters. Although the exclusive agreement apparently covers only John Deere Headquarters, Moore's relationship with Deere effectively makes it the preferred supplier for other Deere entities. For example, although John Deere dealers may purchase forms from any dealer, Moore has an agreement with Deere under which Deere's dealers can place form orders through headquarters and those orders are forwarded to Moore. In addition, Moore was the only form dealer that was permitted to set up a sales and marketing booth at Deere's national convention.

Since the defendants left Moore, they have sold products to at least thirteen of the customers to whom they were assigned during their last year with Moore. Sales to their former Moore customers account for nearly ninety (90) percent of the dollar volume of Solutions' total sales. In addition, Glenda Wilson has admitted soliciting business from additional former Moore clients without suc-

---

restrict the Wilsons' ability to "[s]ell, manufacture, distribute, or solicit orders for any [business forms or related products] or service in any sales territory in which [they] acted during one year preceding" the end of their employment.

cess. The Wilsons, however, assert that these sales do not represent literal, or actual, violation of the terms of the covenants not to compete because Michael sells to Glenda's former Moore accounts, not his own former accounts, and vice versa.

Since leaving Moore, Michael Wilson has continued to maintain business contacts with Deere. The evidence reflects that he submitted a solicitation letter to the John Deere Dubuque Works and a bid proposal for John Deere outsourcing. Solutions has produced invoices for sales by the defendants to John Deere Credit Union and Equipment Remarketing Services. In November 1995, Michael attended a meeting with Deere's supervisor of general purchasing (Moore's primary contact with Deere) and Larry Zavadil, the president and owner of American Business Forms. After the meeting, they toured a Deere facility in connection with the defendants' submission of a bid for outsourcing of business at Deere's distribution center.

During her last year with Moore, Glenda Wilson's key accounts included Finley Hospital, United Clinical Lab, Iowa Medical Clinic and Mercy Health Center. Since leaving Moore, Michael Wilson has secured purchase orders with each one of those customers, despite having had limited or no experience selling to them in the past. In addition, Glenda Wilson, as a representative of Solutions, visits each of those business in person, meets with people in authority and physically produces almost all of the purchase orders for business forms for their accounts. Michael Wilson admitted that Glenda consulted with him to determine the selling price on those sales.

The defendants do not dispute that they signed the subject employment agreements or the content of the agreements. Rather, the defendants contend that the restrictive covenants contained within those agreements do not support the imposition of a preliminary injunction for a number of reasons: (1) the covenants are not valid for lack of mutual consent based on mistake; (2) even if agreed to, the covenants were not validly entered into for lack of consideration; (3) the covenants are not enforceable because they are over broad or because the balance of equities favors the defendants; (4) the covenants are not enforceable because the plaintiff breached the employment contract; (5) the plaintiff cannot enforce the covenants based on the equitable defenses of laches and unclean hands.

## Preliminary Injunction

The plaintiff requests a preliminary injunction to enforce, in part, the terms of the restrictive covenants included in employment agreements with the Wilsons. When engaging in an inquiry into the necessity of issuing a preliminary injunction, the fundamental question for the court is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits of the case are determined. *Modern Computer Systems v. Modern Banking Systems*, 858 F.2d 1339, 1344 (8th Cir.1988) (citing *Dataphase Systems, Inc. v. CL Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981) (en banc)). In addressing this fundamental question, the Court must address four factors relevant to weighing and balancing the relative equity of imposing or denying the injunction: (1) the threat of irreparable harm to the movant; (2) the balance between that harm and any injuries that granting an injunction will inflict on other litigants; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase*, 640 F.2d at 113. However, no single factor is dispositive. In each case, the court must consider all of the factors in light of the facts of the particular case and determine whether on balance they weigh towards granting the injunction. *Id.*, see also *Baker Elec. Co-Op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir.1994) (quoting *Calvin Klein Cosmetics Corp. v. Lenox Lab.*, 815 F.2d 500, 503 (8th Cir.1987)). However, a party moving for a preliminary injunction must show the threat of some irreparable harm. *Baker Elec.*, 28 F.3d at 1472; *Dataphase*, 640 F.2d at 114. The burden of establishing the need to issue a preliminary injunction is on the movant. *Baker Elec.*, 28 F.3d at 1472.

## Restrictive Covenants

As an initial matter, the Court notes that Iowa courts [3] have long upheld the validity of covenants not to compete, or at the very least have ordered trials on their validity and enforceability. *Curtis 1000, Inc. v. Youngblade,* 878 F.Supp. 1224, 1257 (N.D.Iowa 1995) (citing *Ma & Pa Inc. v. Kelly,* 342 N.W.2d 500, 501–02 (Iowa 1984)). Iowa courts will enforce restrictive covenants contained within employment contracts where the covenants: (1) are reasonably necessary for the protection of the employer's business, and (2) do not unreasonably restrict the employee's rights and are not prejudicial to the public interest. *Id.* at 1257–58 (citing *Iowa Glass Depot, Inc. v. Jindrich,* 338 N.W.2d 376, 381 (Iowa 1983)); *see also Ehlers v. Iowa Warehouse Co.,* 188 N.W.2d 368 (Iowa 1971). This two-part enforceability test is in essence a reasonableness standard which requires the court to maintain a proper balance between the interests of the employer and the employee. *Id.* Although the law affords protection to business interests of the employer, the restriction placed on the employee must be no greater than necessary to protect the employer and may not create hardships on the employee out of proportion to the benefits the employer may be expected to gain. *Id.* In determining the necessity to issue a preliminary injunction, the Court must examine the facts of the case in light of these standards and through the prism of the four *Dataphase* factors.

### 1. Irreparable Harm

■ Although no single *Dataphase* factor is dispositive, *Dataphase,* 640 F.2d at 113; *see also Baker Elec.,* 28 F.3d at 1472, a party requesting a preliminary injunction must show the threat of some irreparable harm. *Baker Elec.,* 28 F.3d at 1472; *Dataphase,* 640 F.2d at 114. Irreparable harm may be established through a showing that the moving party does not have an adequate remedy available at law. *Curtis 1000,* 878 F.Supp. at 1247 (citing *Baker Elec.,* 28 F.3d at 1473; *Frank B. Hall & Co. v. Alexander & Alexander, Inc.,* 974 F.2d 1020, 1025 (8th Cir.1992)). Conversely, proof of the existence of an adequate legal remedy supports an inference of the absence of irreparable harm. *Id.* The

mere availability of a valid damages claim, however, does not preclude the issuance of a preliminary injunction because money damages may not fully compensate a movant's less tangible injuries. *Id.* at 1248 (citing *Glenwood Bridge,* 940 F.2d at 371–72.).

■ In the instant case, the plaintiff alleges injury to the value of its goodwill and business relationships with the customers that the Wilsons serviced during their employment with Moore. Such injury-to-goodwill injuries constitute the sort of intangible injuries which may be found to be irreparable harm for the purpose of weighing the propriety of an injunction. *See Modern Computer Systems, Inc.,* 858 F.2d at 1345; *N.I.S. Corp. v. Swindle,* 724 F.2d 707, 710 (8th Cir.1984); *Medtronic, Inc. v. Gibbons,* 684 F.2d 565, 567 (8th Cir.1982).

The courts of a number of states have held that the mere violation of a valid covenant not to compete supports an inference of the existence of a threat of irreparable harm. *See Curtis 1000,* 878 F.Supp. at 1273; *Overholt Crop Ins. Serv. Co.,* 941 F.2d at 1371 (relying on *Cherne Indus., Inc. v. Grounds & Assocs.,* 278 N.W.2d 81, 91 (Minn.1979) (Minnesota law)); *JAK Prod., Inc. v. Wiza,* 986 F.2d 1080, 1084 (7th Cir.1993) (relying on *Peters v. Davidson, Inc.,* 172 Ind.App. 39, 359 N.E.2d 556, 561 (1977) (Indiana law)); *Picker Int'l, Inc. v. Blanton,* 756 F.Supp. 971, 983 (N.D.Tex.1990) (relying on *Williams v. Compressor Eng'g Corp.,* 704 S.W.2d 469, 470 (Tex.Ct.App.1986) (Texas law)). In addition, the Eighth Circuit seems to have adopted this approach, without reference to a particular state's law. *See N.I.S. v. Swindle,* 724 F.2d 707, 710 (8th Cir.1984). In *N.I.S.,* an insurance company brought an action to enjoin former sales agents from soliciting business from its policy-holders in violation of a purported restrictive covenant. *N.I.S. Corp,* 724 F.2d at 710. The Court affirmed the District Court's finding of the threat of irreparable harm based on evidence that the individual defendants were affirmatively soli-

---

3. In evaluating the likelihood of success on the merits, the Court must look at the facts of the case in light of the applicable substantive law.

In this case, the parties do not dispute that the governing law is the law of Iowa.

citing business from the plaintiff's policy-holders. *Id.* The court reasoned:

> "[i]f the noncompete agreements are valid, then we think an irreparable injury has been shown. As noted by the district court, the lack of a preliminary injunction would leave N.I.S. with the Hobson's choice of either filing a separate lawsuit for damages (or at least an amendment to an initial suit) each time one of the defendants solicited away another Ozark customer or waiting until Ozark's Alabama customers and goodwill had been completely drained away."

*Id.* The same holds true here. If the restrictive covenants at issue prove to be valid and enforceable, continued violation of the covenants will cause the plaintiff to suffer some irreparable harm to goodwill and its established relationships.

 In the instant case, there is clearly a threat of irreparable harm to Moore's relationships with Deere and with Glenda's key accounts. Given the extent of Moore's past business with those accounts, and the defendants' role in conducting that business for Moore in the past, Moore's goodwill is likely to be bound up with the defendants' relationships with those clients. To the extent that they are permitted to continue to conduct business with those clients, there is a risk of eroding the goodwill that the defendants helped establish on Moore's behalf. Although it is less clear that the Wilson's competition for business with their less significant former accounts creates the threat of a significant degree of harm to Moore, this concern is a matter of degree and will be duly considered in evaluating the balance of harms factor below. Whether the extent and severity of the injury merits the issuance of a preliminary injunction depends on an analysis of all of the *Dataphase* factors and a balance of the relative harms. At this point, the court finds that the plaintiff has met the minimum initial hurdle of showing the threat of some irreparable harm to all of the accounts that the defendants serviced during their last year with Moore. The Court must direct its attention to other *Dataphase* factors to determine the propriety of an injunction.

## 2. Likelihood of Success on the Merits

One further *Dataphase* factor is the likelihood that the movant will succeed on the merits of the case. The defendants argue that the plaintiff will not succeed on the merits because the restrictive covenants at issue are both invalid and unenforceable. In the first instance, they assert contract formation defense of mistake with respect to the initial employment agreements signed when they first joined Moore. With respect to the later-signed employment agreements, the Wilsons argue that those contracts were not supported by sufficient consideration. In addition, they assert that it would be inequitable to enforce the covenant against them because the restrictions are over broad and would cause severe hardship. Finally, they assert the equitable defenses of laches and unclean hands to avoid the imposition of the equitable relief of a preliminary injunction.

### A. Validity

 Because covenants not to compete are contractual agreements, *Curtis 1000*, 878 F.Supp. at 1259 (citing *Iowa Glass*, 338 N.W.2d at 381), they must be supported by consideration, *Id.*, and may be invalidated under the doctrine of mistake. *Pathology Consultants v. Gratton*, 343 N.W.2d 428 (Iowa 1984). The defendants argue that the covenants not to compete contained in their initial employment contracts with Moore are invalid under the doctrine of mistake because they did not know that the provisions were in the contracts, and further, that the covenants included in later-signed employment agreements are invalid for lack of consideration. Both arguments are without merit.

 Regardless of the merit of defendants' arguments with respect to their lack of knowing consent to the covenants in their initial employment agreements, their claim that their lack of business sophistication allowed Moore to obtain their unwitting signatures on the covenants does not carry the same weight with respect to the agreements signed in 1993, when the defendants were both experienced, successful sales professionals with years of experience in the industry. In any case, the claim that they did not

understand their obligations under the covenants rings hollow in light of the elaborate account reassignment measures the defendants claim to have taken to avoid potential conflicts under the covenants.

■ With respect to the later-signed employment agreements, the Wilsons' continued employment after entering into the agreements is sufficient consideration to support formation of the covenants not to compete. *See Farm Bureau Service Co. of Maynard v. Kohls*, 203 N.W.2d 209 (Iowa 1972). The defendants' continued employment persuades this court that the plaintiff has a substantial likelihood of success on the merits with respect to the existence of a contract. Without foreclosing the defendant's opportunity to assert any defenses to the valid execution of the covenants, the court finds that, at least for the purposes of this motion, that the plaintiff will likely succeed on the merits of the validity of the formation of the restrictive covenants.

### B. Enforceability

Assuming the employment agreements were validly formed including the restrictive covenants, the defendants nevertheless assert defenses against the enforcement of the clauses as written. They argue that the covenants are unreasonably restrictive in geographic and temporal scope and that the covenants are not enforceable because the plaintiff breached the employment agreement before they terminated their employment.

■ Under Iowa law, courts generally enforce restrictive covenants contained within an employment contracts if the covenant is: (1) reasonably necessary for the protection of the employer's business, and (2) is not unreasonably restrictive of the employee's rights nor prejudicial to the public interest. *Iowa Glass Depot, Inc. v. Jindrich*, 338 N.W.2d 376, 381 (Iowa 1983); *Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368 (Iowa 1971). This two-part enforceability test is in essence a reasonableness standard which requires the court to maintain a proper balance between the interests of the employer and the employee. *Id.* Although the law affords protection to business interests of the employer, the restriction placed on the employee must be no greater than necessary to protect the employer and may not create hardships on the employee out of proportion to the benefits the employer may be expected to gain. *Id.* The reasonableness of the necessity to enforce a covenant to protect an employer's legitimate business interests depends on a variety of factors, including an employee's close proximity to customers and access to peculiar knowledge gained through employment that provides a means to pirate the customer, the nature of the business to be protected and the occupation to be restrained, the employees' access to information peculiar to the employer's business, the opportunity to take some part of the employer's goodwill, the reasonable expectation that some of the employer's customers will follow the employee to the new employment, and general matters of basic fairness. *See Iowa Glass*, 338 N.W.2d at 382 and *see also Ehlers v. Iowa Warehouse Co.*, 188 N.W.2d 368 at 373 (Iowa 1971).

■ The defendants argue that the court should not enforce the covenants to any extent because the language of the covenants contained in the employment agreements includes a broad prohibition against selling any business forms in any of the areas that they served during the last year at Moore. The Wilsons correctly note that restrictive covenants must be reasonably limited to geographic and temporal scope to be enforceable. However, even where restrictive covenants purport to impose overly stringent restraints, Iowa law favors partial enforcement to the extent reasonably necessary to protect the employer's legitimate interests. *Ehlers*, 188 N.W.2d at 371–72 (adopting *Solari Industries, Inc. v. Malady*, 55 N.J. 571, 264 A.2d 53, 61 (1970). In the instant case, the plaintiff seeks only narrow enforcement of that portion of the non-compete covenants prohibiting sales to customers that the defendants dealt with during their last year with Moore. The time and geographic restrictions sought to be enforced by the plaintiff, (two years and clients they served within one year prior to termination of employment) fall well within the restrictions which Iowa courts routinely find rea-

sonable and enforceable. *See Curtis* 1000, 878 F.Supp. at 1269 (citing *The Phone Connection,* 494 N.W.2d at 449–50 (two year limitation reasonable); and also citing *Dain Bosworth, Inc.,* 356 N.W.2d at 593) (restriction to prior sales area reasonable)). The restriction sought in this case is even less restrictive than the restriction imposed in *Dain Bosworth,* as it is limited to customers that the defendants dealt with on behalf of Moore during the one year prior to leaving its employ. *Id.*

The Wilsons argue that the business of selling business forms is the sort of business in which no legitimate business interests are served by enforcing restrictive covenants because the sale of business forms constitutes the sale of ordinary goods, rather than the sale of services. They rely primarily on *Curtis 1000, Inc. v. Suess,* 24 F.3d 941, in which the court held that Illinois law did not permit the imposition of an injunction in the case of a restrictive covenant involving the sale of business forms. Their reliance on *Suess,* however, is misplaced. In *Suess,* the Court disallowed a preliminary injunction under Illinois law, which permits the issuance of preliminary injunctions to protect a narrower class of interests than the legitimate business interests protected under Iowa law. *See Id.* at 948. Despite ruling that the preliminary would not issue under Illinois, the Court noted that the plaintiff had made a case for a preliminary injunction under Delaware, which like Iowa law permits injunctions to protect "legitimate" business interests of an employer. Accordingly, *Suess* does not provide a safe harbor for the defendants to anchor their resistance to this motion.

Although *Suess* is not directly applicable, some of the concerns at issue in *Suess* are also relevant to the enforceability equation under Iowa law; close customer contact and peculiar knowledge of former customers' business practices, the nature of the business to be protected and the occupation to be restrained, the opportunity to take some part of the employer's goodwill and the reasonable expectation that some of the employer's customers will follow the employee to the new employment are all factors weighing in favor of enforcing a restrictive covenant. *See Curtis 1000,* 878 F.Supp. at 1269; *Iowa Glass,* 338 N.W.2d at 382–83; *Ehlers,* 188 N.W.2d at 373, and general matters of basic fairness. *See Iowa Glass,* 338 N.W.2d at 382 and *see also Ehlers v. Iowa Warehouse Co.,* 188 N.W.2d 368 at 373 (Iowa 1971).

The Wilsons assert that the sale of business forms is no different than the sale of fungible goods for which the primary consideration is price, and the sales representative's personal familiarity with a client, his business and business practices does not have a significant bearing on the ability to secure sales. This argument, however, works at cross purposes with other of the defendants' claims, in particular, it undercuts their claim that imposition of an injunction would harm them. If true, they should be able to generate sales with equal success to either a new client base or their former Moore customers. Unless their former Moore customers so dominate the market within the Wilsons' sales area, such that the inability to sell to them significantly affects their ability to maintain their sales volume, an injunction would not seriously impede their ability to make a living. An injunction would merely prompt the defendants to target different customers and would not significantly affect sales.

The evidence, however, does not fully support the defendants' view of the passive and neutral role sales representatives play in the business forms sales arena. The record reveals numerous references to sales calls, conferences, and meetings with executives of their clients. In addition, the evidence of the defendants' sales record since leaving Moore reflects significantly higher success rate in securing sales to their former Moore clients than to their new client list. Although this alternative view of business forms sales representatives weighs toward recognizing that the plaintiff's legitimate interests would be served by enforcement of the covenants, it also points toward finding a greater harm to the defendants. The court will address the relative weight of the harms below.

Finally, the Wilsons argue simply that an injunction is improper because they are not violating the restrictive covenants. Although

they admit that a substantial portion of Solutions' business constitutes sales to former Moore customers that had been served by Glenda or Michael during their last year with Moore, they claim that Michael sells to Glenda's former Moore accounts, and that Glenda sells to Michael's former Moore accounts, thus avoiding a literal violation of the terms of the covenants. Although this argument may have been dispositive if supported by the record, the evidence before the court suggests that Wilsons have not maintained the sort of rigid bifurcation of their business operations as claimed. The record reflects substantial assistance by each of the defendants in securing sales to their former clients on behalf of the other.

Despite their claims of running a strictly segregated sales operation, their testimony indicates a certain amount of mutual assistance which would run afoul of the non-compete agreements. Although the defendants claim that Michael Wilson exclusively sells to several of Glenda Wilson's former Moore accounts, they admitted that Glenda meets with people in authority at some of those businesses, visits the businesses and physically produces most of the purchase orders for business forms for the accounts. Michael testified that he consults with Glenda to determine the selling prices for sales to her former Moore accounts. In addition, Michael Wilson admits that he had solicited business from and sold business forms to John Deere, one of his former Moore accounts, after leaving his Moore employment. Finally, evidence suggests that it is the exploitation of well established professional relationships established during their tenure at Moore, not merely competitive pricing, is responsible for the Wilsons' relatively greater success in securing sales to former Moore clients as opposed to new clients. For the purposes of weighing the necessity of issuing a preliminary injunction, the court is not persuaded by the defendants' claims of segregated selling practices and finds that plaintiff has a substantial likelihood of succeeding on the merits.

### C. Equitable Defense

■ The defendants assert that the plaintiff is barred by the doctrine of Laches

from pursuing a preliminary injunction. The Wilsons argue that the plaintiff first warned them about the non-compete agreement in July, but failed to act for another five months. Laches has two elements: (lack of diligence by the plaintiff and (2) injurious reliance on that delay by the defendant.) *See, e.g., Iowa Student Public Interest Research Group v. Callaway*, 379 F.Supp. 714, 720 (S.D.Iowa 1974); *Anita Valley, Inc. v. Bingley*, 279 N.W.2d 37, 41 (Iowa 1979). The defendants do not meet either element. The fact that the plaintiff put the defendant on notice of the dispute soon after learning of a possible violation of the covenant defeats the first element, and the fact that the defendants began the actions that form the basis for the plaintiff's claims shortly after leaving Moore, indicates that they did not rely on any delay on the part of the plaintiff.

■ Finally, the Wilsons argue that the plaintiff may not enforce the covenants against the defendants because it breached the employment agreement with them. In Iowa, a breaching party cannot demand performance from the non-breaching party. *Orkin Exterminating Col v. Burnett*, 259 Iowa 1218, 146 N.W.2d 320, 325 (1966). The Wilsons assert that Moore breached its employment agreement with the defendants by unilaterally altering the compensation structure to their detriment. The employment agreement, however, does not promise any particular level of compensation or form of compensation structure. Although the defendants admit that the contract allowed Moore to change the compensation structure, they argue that the change violated Moore's written policy to "maintain compensation programs designed to attract, retain and motivate highly qualified associates and ... assure external competitiveness and internal equity among position."

### 3. Public Policy

■ The defendants have not identified any significant public policy that would weigh against granting an injunction in this case. However, the defendants' public policy arguments merely restate their position that an injunction would not be equitable. Because Iowa law routinely enforces reasonable re-

strictive covenants and grants injunctions in appropriate cases, the public policy of Iowa would be served by imposing an injunction to the extent necessary under the balancing test provided under Iowa law and the other Dataphase factors. *See e.g. N.I.S.*, 724 F.2d at 710 ("[I]f these non-compete agreements are valid, the public interest calls for their enforcement."). Absent any other overriding public policy, the propriety of an injunction rests on the threat of irreparable harm, the plaintiff's probability of prevailing on the merits, and on the relative balance of the harm to the plaintiff if the injunction does not issue and the harm to the defendants if an injunction is imposed.

### 4. Balance of the Harms

As noted above, to the extent that the defendants have violated a valid and enforceable covenant not to compete, the plaintiff will likely suffer some irreparable harm. Because the plaintiff appears to have a significant likelihood of prevailing on the merits, at least based on the evidence before the court, and no other public policy would be violated by imposing a preliminary injunction if otherwise required, the defendants' hopes of avoiding an injunction rest primarily on balance of the relative harm on the plaintiff in the event an injunction is not issued and on the defendants in the event an injunction is issued.

The facts of each case must be evaluated independently. In some cases, the determinative factor may be the harm to the plaintiff. For example, in *Curtis*, the overriding factor that tilted the balance in favor of granting an injunction was the threat of imminent, substantial harm to both the employer and its employees. In that case, the court noted that one of the clients that the former employee was poised to take represented over two million dollars of business annually, and that loss of that account would likely result in closing a manufacturing plant with a resultant loss of thousands of jobs. In this case, although Moore has clearly suffered some loss, there is no indication of such drastic or compelling harm. On the other hand, the determinative factor may be the harm or lack of harm to the defendant in the

event of an injunction. In *N.I.S.*, one of the primary factors weighing in favor of granting an injunction was the defendant's admission that an injunction would not critically injure their overall business. *See N.I.S.*, 724 F.2d at 710. The situation in this case lies somewhere between the two. Although the plaintiff will suffer and has suffered some loss of business, it is not of the severity presented in *Curtis*. In addition, whereas the defendant in *N.I.S.* agreed that an injunction would not harm their business, the defendants assert that an injunction will severely harm their ability to make a living and support their children.

■■■■■ On balance, the court finds that the balance of harms in the instant case favors granting an injunction with respect to sales to John Deere and to Glenda's former key accounts. For each of those accounts, the defendants played a key role in securing and servicing a significant volume of business for Moore. The potential for harm to Moore is great, given the both the volume of business and the relationships developed between the defendants and their clients. In light of the plaintiff's likelihood of success on the merits, the potential harm to the plaintiff weighs in favor of granting the injunction. In addition, the defendants argue that competitive pricing alone, and not their past relationship with their former Moore clients, has fueled their success in obtaining orders. To the extent that their argument is correct, they should not be harmed by soliciting orders from new customers; there is no apparent reason that they should not be as price competitive with new customers. With respect to the defendants' other, less significant former Moore accounts, the Court finds that there is little threat of harm to Moore. Each of those clients represents a small enough amount of business such that they will not be severely harmed by competition with the defendants. The balance of harms weighs against the imposition of a preliminary injunction enjoining sales to those other accounts.

### Conclusion

The plaintiff has met their burden of establishing the necessity to enjoin the defen-

dants from selling business forms and related products to John Deere and Glenda's former key accounts but not from selling to the other, less significant accounts. The potential loss of business goodwill between Moore and the defendants' former accounts creates a threat of irreparable harm. In addition, the Court finds that the plaintiff has a significant likelihood of prevailing on the merits. In light of the plaintiff's likelihood of success on the merits, the balance of harm to the plaintiff in the absence of an injunction outweighs the threat of harm to the defendants caused by an injunction with respect to sales to John Deere and Glenda's key accounts. Given the low volume of Moore's past sales to the defendants' other, less significant accounts, the threat of harm to the plaintiff does not weigh toward imposition of an injunction.

Accordingly, **It Is Ordered:**

1. The defendants are hereby enjoined from selling business forms and related products to John Deere Company, its dealers and other related corporate entities until April 19, 1997.

2. The defendants are hereby enjoined from selling business forms and related products to Crescent Electric Supply, Flexsteel Industries, Inc., Finley Hospital, Mercy Hospital in Iowa City, Mercy Health Center in Dubuque, Samaritan Hospital in Clinton, and United Clinical Labs until April 19, 1997.

3. The plaintiff's Motion for Preliminary Injunction with respect to other accounts serviced by the defendants during their final year with Moore is denied.